**STATE of Tennessee, Appellee,**

v.

**Steve KYGER and Rondol Hammer, Appellants.**

Court of Criminal Appeals of Tennessee, at Nashville.

Sept. 27, 1989.

Permission To Appeal Denied by Supreme Court Feb. 5, 1990.

_____

Richard McGee, Nashville, for Kyger.

Scott Daniel, Murfreesboro, for Hammer.

Charles W. Burson, Atty. Gen. and Reporter, Debra K. Inglis, Asst. Atty. Gen., Nashville, Guy R. Dotson, Dist. Atty. Gen., Murfreesboro, for State of Tenn.

## OPINION

WADE, Judge.

The defendants, Rondol Hammer and Steve Kyger, were convicted of first degree murder, armed robbery, and joyriding. Each received sentences of life, 35 years and 3 years, respectively. The 35 year sentences are to run consecutive to the life sentences; the 3 year sentences are concurrent.

In addition to an attack upon the sufficiency of the evidence, the defendants present the following issues on appeal:

(1) whether a change of venue should have been granted;

(2) whether the defendants' trials should have been severed;

(3) whether probable cause existed to arrest Kyger;

(4) whether Kyger's _Miranda_ rights were violated;

(5) whether the police failed to take Kyger before a magistrate without unreasonable delay;

(6) whether certain evidence was properly admitted against Hammer;

(7) whether a photograph of the victim was properly admitted;

(8) whether conduct of the trial court and prosecutor prejudiced Hammer;

(9) whether certain jury instructions were proper; and

(10) whether the jury verdict form was sufficient.

We find no reversible error and affirm the judgment of the trial court.

On November 14, 1986, the victim, Frank Robinson, was shot and killed during an armed robbery in Murfreesboro. As was his custom at 4:30 P.M. on each Friday, Robinson left the IGA grocery he co-owned in order to cash checks at a local bank. Afterwards, he returned to the store with approximately $9,000 in cash.

A red truck with a camper top, later determined to be stolen, followed Robinson into his parking lot. Two individuals got out of the truck, drew their guns, and attempted to take the bank bag from the victim. When Robinson resisted, he was shot by the individual who had emerged from the passenger side of the vehicle. The two men then returned to the truck and sped off. Witnesses at the scene described the passenger as a white male approximately 5'7" to 5'8" tall and weighing approximately 165 to 170 lbs. He wore a dark army fatigue-type jacket, a dark ski mask and blue jeans. The driver, also a white male, was taller and thinner. His clothing was similar to the passenger's but he wore a looser, sweatsuit-type jacket.

Witnesses saw the getaway truck driven erratically on a street near the scene of the robbery. The vehicle was pulled into a parking lot and the driver and passenger hurriedly jumped out.

Other witnesses saw a bearded white male, similar in description to the passenger of the truck, carrying something in his hand as he ran across Northfield Avenue. Cars slammed on their brakes in order to miss him. The man ran towards a ditch in the back of the Haynes Manor Apartments.

Approximately an hour and a half after the robbery, police observed Kyger enter the PDQ Pizza Store, located within a mile of the murder scene. He had dark hair, a beard, wore a dark shirt, blue jeans, and generally fit the description given of the passenger. Police detected that his blue jeans were soaking wet from the knees down and that his boots were filled with water as if he had recently walked through a stream. Despite a drizzling rain, the rest of his clothing was fairly dry. Kyger's hair was matted and he wore no jacket despite 30 to 40 degree temperatures. He placed an order for a pizza under the name of Hammer.

When asked where he was during the shooting, Kyger stated that he had worked at Hammer's Automotive (owned by his co-defendant and brother-in-law Rondol Hammer) until approximately 4:45 P.M.; afterwards, he walked toward "Bo Hill's house," which he was unable to find. Police first took Kyger to the location of the truck and eventually to the police station. When questioned at the police station, he gave a largely exculpatory statement.

Police found a police scanner in the abandoned truck which they eventually traced to Hammer. His fingerprints were found on both the scanner and the ashtray of the stolen truck. The truck's owner testified that he had never taken the truck to Hammer's or any other garage for repairs.

A pair of dark blue coveralls and a dark ski mask with the price tag still attached were found near a stream behind the Haynes Manor Apartments. The coveralls were identified by Virginia Hulse, a co-worker of Kyger, as a pair she had loaned Kyger while he worked on a car at her home. The defendant had never returned the coveralls, which had Ms. Hulse's name printed on them.

Police conducted two searches of the Hammer residence where both defendants lived. In the second search, an army fatigue type jacket was found in the closet Kyger used. A swab test of Kyger's hands taken during his initial interrogation revealed gunshot residue, consistent with his having fired a gun.

When questioned by police, Hammer denied any knowledge of the red truck. He told police that he and his wife had gone to Taco Bell, University Ford, Stones River Motors and Franklin Nissan on the afternoon of the robbery. He claimed that he bought the scanner at a flea market and that it had been stolen from him some two months before the murder. Hammer admitted that he did not report its theft. Police learned later that Hammer had actually acquired the scanner at an auto parts store. During his interrogation, Hammer said, "I might be up to my neck in it, but I didn't do it."

At trial, Kyger presented no proof.

Hammer's wife testified that she left work at 4:30 P.M., took about 15 to 20 minutes to drive to her husband's shop, and waited there about 10 minutes while he finished his work. Afterwards, the two went to Taco Bell and then to University Ford where they spoke to a car salesman. They drove through the parking lot at Stones River and then traveled about 30 minutes to a Nissan dealer in Franklin. Mrs. Hammer dropped her husband off at his business to pick up his car and returned home; he arrived about five minutes later. The next day Hammer and his wife returned to Franklin Motors and purchased a car they had seen the day before.

The sales manager at Franklin Motors confirmed that he saw the Hammers on the day after the homicide but could not recall their presence on the day of the shooting. The salesman at University Ford claimed to have spoken with the Hammers on either the 14th or 15th of November. He did not, however, have their names on his "up list" (written records of his prospective clients) or remember their names when he was initially questioned by police.

Hammer's other witnesses claimed to have seen a red truck turning into Red Line Foods at 4:30 P.M. and into the Haynes Manor Apartments at 4:55. One witness saw the truck making a U-turn into the apartment complex at about 5:00 P.M. This witness originally described the truck as having a police CB antenna, a license plate containing numbers 36189, and something "greenish" on its rear. None of these descriptions fit the truck used in the robbery.

Another of Hammer's witnesses testified he saw a red Ford truck cut in between his car and that driven by the victim on Northfield Avenue at about 5:00 to 5:15 P.M. He described the two men in the truck as wearing navy or black stocking caps. The driver was tall and skinny with reddish, shoulder length hair. The passenger was "fat and low."

Other witnesses confirmed Hammer's presence at his shop until 4:55 P.M. One witness stated that only a few months be-

fore the robbery, he had helped Hammer move a red truck with a camper top which was blocking their way. This evidence was presented in an attempt to explain Hammer's fingerprint in the stolen truck. This truck, however, had a camper that extended over the driver's compartment, while the robbers' truck did not. It was described as "beat up" while the body of the truck used in the robbery was in good condition.

Although the state's proof was entirely circumstantial, a criminal offense may be established exclusively by such evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn.1973). Whether the conviction is based on direct or circumstantial evidence, the standard for appellate review is the same. *State v. Brown*, 551 S.W.2d 329 (Tenn.1977).

On appeal, the state is entitled to the strongest legitimate view of the evidence, together with all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn.1978). A verdict against the defendant removes the presumption of innocence and raises a presumption of guilt, *Anglin v. State*, 553 S.W.2d 616, 620 (Tenn. Crim.App.1977), which the defendant has the burden of overcoming. *Pennington v. State*, 573 S.W.2d 755, 757 (Tenn.Crim.App. 1978).

Viewed in this manner, the appropriate standard is whether any rational trier of fact could find the elements of the crime beyond a reasonable doubt. Rule 13(e), Tenn.R.App.P.; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

As to Kyger, the evidence established that a man fitting his description shot and robbed the victim and was seen leaving the scene in a red truck. A short distance from where the truck was abandoned, a man fitting Kyger's description was observed running across a busy street towards the rear of an apartment complex; he wore a ski mask. Dark coveralls loaned to Kyger matched those described by witnesses to the shooting and were found where the gunman fled. Kyger was picked up a short distance from the apartments. His appearance was consistent with having waded through water and with having worn a jacket and a cap. He was without a coat despite the cold weather, consistent with his having discarded his outer garments. Gunpowder residue was found on Kyger's hands, consistent with his having recently (normally within 6 to 8 hours) fired a gun. In our view, this circumstantial evidence was sufficient to identify Kyger as the gunman in the offenses beyond a reasonable doubt.

The proof established that Hammer had a build similar to the driver of the getaway truck. His scanner was found inside the vehicle. His fingerprints were found both on the scanner and on the handle of the truck's ashtray. There was no reasonable explanation how else Hammer's fingerprint could have been left in the truck. The jury was well within its prerogative in rejecting both his alibi defense and his testimony that his scanner had been stolen. All reasonable hypotheses other than Hammer's guilt were eliminated. We believe the evidence was sufficient.

This issue is without merit.

### I

The defendants contend that, because of pretrial publicity, the trial court should have granted its motion for a change of venue. A ruling was withheld until the completion of *voir dire*. Each prospective juror was individually examined on their exposure to various media reports. After selection of the panel, the motion was denied.

The pertinent portion of Rule 21(a), Tenn.R.Crim.P. provides as follows:

[T]he venue may be changed ... if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had.

Whether to grant or deny a motion for change of venue is a matter of judicial discretion. *Rippy v. State*, 550 S.W.2d 636, 638 (Tenn.1977). The ultimate test is

whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity. *State v. Garland*, 617 S.W.2d 176, 187 (Tenn.Crim.App.1981). The burden of proof is on the defendant. *Adams v. State*, 563 S.W.2d 804 (Tenn. Crim.App.1978). Prejudice will not be presumed on the mere showing that there was considerable pretrial publicity. *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

■ In our view, the publicity, although considerable, largely recited the undisputed facts of the case, i.e., the fact that the victim had been killed during a robbery at the IGA Grocery. Even though the pretrial media reports were extensive from the time the crimes were committed until the defendants' trial, the *voir dire*, in our opinion, clearly reflects a diminution in the degree of its intensity.

The one article which could be classified as "inflammatory" included details of Kyger's prior murder conviction as a juvenile. The trial court found the article to be prejudicial and excused for cause all prospective jurors who had been exposed to it. Care was exercised in the selection of the jury. All other questionable jurors were excused for cause.

At the conclusion of the selection process, Kyger's counsel, who had not used all of his peremptory challenges, announced that there was no one left on the panel whom he would challenge [for cause]. This issue, therefore, is waived as to Kyger. *See Garland*, 617 S.W.2d at 186. *Sommerville v. State*, 521 S.W.2d 792, 797 (Tenn.1975).

Hammer exercised all of his peremptory challenges; his counsel challenged for cause only one juror left on the panel. Our review supports the trial court's determination that the challenged juror was competent. The facts the juror had read or heard from pretrial reports were not in dispute. While he was uncertain as to the accuracy of his recollections of media reports, he expressed no doubt of his ability to sit impartially and agreed to disregard whatever he might have seen or heard from the media.

Three jurors had no knowledge whatsoever of the defendants or the charges placed against them. All others, despite a casual familiarity with the circumstances, expressed their resolve to base their verdict solely upon the evidence presented rather than any media reports. None of the jurors was aware of the defendants' prior records.

The defendants base a portion of their argument to change venue on the statements of Timothy Demonbreum who was ultimately excused from the panel by a peremptory challenge. During his examination, Demonbreum said that he doubted the community's ability as a whole to set aside their pre-conceived opinions of the defendants' guilt. No other jurors heard his comments.

Defense counsel argue that Demonbreum was correct in his assertions; the trial court held otherwise. The mere fact that there was extensive knowledge in the community of the crimes and the defendants is not sufficient to render the trial constitutionally unfair. *Dobbert*, 432 U.S. at 303, 97 S.Ct. at 2303. Demonbreum's opinion has little weight; it was the trial court's responsibility to determine whether the defendants would be prejudiced by the Rutherford County jury. The fact that many of the jurors knew little or nothing of the crimes in advance of trial supports the trial court's conclusion. In our view, the remarks clearly did not prejudice the defendants' rights to an impartial jury.

In summary, neither defendant has established an abuse of the trial court's discretion by its refusal to change venue.

This issue is without merit.

## II

■ Hammer argues that the trial court erred in denying his motion for severance. He claims that certain evidence, admissible against Kyger, had a "spillover effect" which resulted in Hammer's conviction.

Rule 14(c)(2) of the Tennessee Rules of Criminal Procedure provides as follows:

The court, on motion of the State or on motion of the defendant other than under

subdivision (c)(1), shall grant a severance if:

(i) Before trial, it is deemed necessary to protect a defendant's right to speedy trial or it is deemed appropriate to promote a fair determination of the guilt or innocence of the defendants; or

(ii) During trial, with consent of the defendant to be severed, it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants.

Severance is a matter addressed to the sound discretion of the trial court; this court will not interfere with the exercise of that discretion absent clear abuse. *Hunter v. State*, 222 Tenn. 672, 440 S.W.2d 1 (1969); *State v. Coleman*, 619 S.W.2d 112 (Tenn.1981). In order to qualify as reversible error, the joint trial must cause prejudice to the defense. *State v. Lunati*, 665 S.W.2d 739, 745 (Tenn.Crim.App.1983).

In our view, the record does not support Hammer's claim of prejudice. The trial court instructed the jury to consider the evidence against each defendant individually; the jury is presumed to have followed this charge. *State v. Barton*, 626 S.W.2d 296, 298 (Tenn.Crim.App.1981). We first note that several prosecution witnesses would have been required to testify against each defendant. In that respect, to have granted separate trials would have constituted a waste of judicial resources. *Id.* More importantly, there was considerable independent evidence by which the jury could have found Hammer guilty of the offenses charged. The presence of Hammer's fingerprints on the interior of the stolen truck, coupled with his otherwise lack of access to the vehicle, is strong evidence of his participation in the robbery and homicide. When a police scanner found inside the truck was identified as Hammer's, the state's case became even stronger.

In our view, Kyger's statement that the military jacket found by officers in his room actually belonged to Hammer was not prejudicial. The jury knew the defendants lived in the same house. The issue was not one of ownership of the jacket but of possession at the time of the offenses. Because each defendant had access to the residence, the jacket would have been admissible against either.

The use of Hammer's name in ordering the pizza did not necessarily implicate Hammer in a crime. The association of the defendants was established by other proof.

We note that Hammer did not make a contemporaneous objection to either statement; no limiting instructions were requested. Any error has been waived. Rule 36(a), Tenn.R.App.P.

There is no indication that severance, under these circumstances, would have served "to promote a fair determination of the guilt or innocence of one or more defendants." Rule 14(c)(2)(i), Tenn.R.Crim.P. We hold that the trial court's instructions properly directed the jury to consider each defendant's guilt separately; in our opinion, no prejudice resulted by the joint trial of the defendants.

This contention is overruled.

### III

Each defendant attacks the trial court's denial of their respective motions to suppress.

Kyger claims that his November 14th and November 24th statements and the physical evidence acquired during his initial questioning should have been suppressed because officers made the arrest without probable cause; violated his right against self-incrimination; and failed to make a timely presentation to a magistrate in compliance with 5(a), Tenn.R.Crim.P.

Kyger was arrested on November 14th. During questioning by police at about 7:30 and again at about 11:15, he was photographed, fingerprinted and subjected to handswab analysis. Kyger signed *Miranda* waivers during each interrogation. Upon completion of the second period of questioning, he was released from custody.

Ten days later, Kyger was again taken into custody and questioned by authorities. He argues that all of this evidence should have been suppressed by the trial court on grounds that the arrest was unlawful.

In *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), Justice Stewart defined probable cause as follows:

> [W]hether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed ... an offense.

*Id.* at 91, 85 S.Ct. at 225.

In 1975, the Tennessee Supreme Court adopted the language of this court on the issue of reasonable or probable cause for arrest:

> In dealing with probable cause, one deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*State v. Jefferson,* 529 S.W.2d 674, 689 (Tenn.1975).

Tenn.Code Ann. § 40–7–103 provides that an officer may make a warrantless arrest for a felony when "he has reasonable cause to believe the person arrested ... committed it."

■ Kyger was taken into custody after being questioned at the pizza restaurant. Police had the following information regarding his possible involvement:

(1) Shortly after the robbery and murder, a person matching the description of one of the two suspects ran across Northfield Boulevard, only 500 to 600 feet from the scene of the crime. He was almost struck by a car.

(2) The suspect ran behind the apartment buildings where a ditch with running water was located.

(3) Kyger was seen within a ¼ mile of the area 15 to 20 minutes later.

(4) He fit the physical description of the robber: about 5'7" and 185 to 200 lbs.

(5) While the rest of his clothing was dry, legs of his blue jeans were soaking wet.

(6) His hair was matted, as if he'd been wearing a hat (witnesses said the robber wore a dark ski mask).

(7) He had given Hammer's name, rather than his own, when ordering a pizza.

(8) If he had come from his brother-in-law's shop, as he claimed, he would have walked by two other pizza restaurants on his way.

(9) Despite 30 to 40 degree weather, Kyger wore no coat or hat.

In our opinion, the information available to the investigating officers, coupled with their reasonable inferences, properly led them to believe that a felony had been committed and that Kyger had committed it. The police were therefore justified in arresting Kyger without a warrant. *West v. State,* 221 Tenn. 178, 425 S.W.2d 602 (1968).

A trial court's finding that an arrest is lawful is binding upon a reviewing court unless the evidence preponderates against it. *State v. Long,* 694 S.W.2d 337 (Tenn. 1985).

■ Because officers had probable cause for the warrantless arrest, there is no merit to the argument that officers could not gather the physical evidence acquired from Kyger's person. Handswabs, fingerprints and photographs are admissible as evidence legally obtained pursuant to Kyger's arrest. W. LaFave, *Search and Seizure,* § 2.6(a) at 459–60, § 5.3(c) at 498 (2nd ed. 1987). These were minor intrusions and "are inherently reasonable when made incident to a lawful custodial arrest." LaFave, § 5.3(c) at 498.

There is no error on this issue.

## IV

Kyger also claims that much of the state's evidence should have been suppressed because his *Miranda* rights were violated when police failed to honor his request for counsel.

The police advised Kyger of his *Miranda* rights during his initial questioning at the police station:

> Q. Steve do you understand them rights?
> A. Yes sir.

Q. Alright having them rights in mind would you answer some of our questions without an attorney present?

A. *I'd just soon have a attorney cause, you know, you all saying that there's been a shooting involved and that's a serious charge.*

Q. Yes it is but we're investigating. We're not saying you shot anybody, we're just investigating. *Now if you have something to hide I could understand you not wanting to sign that. If you ain't got nothing to hide, you know, you'll answer our questions.*

A. I ain't got nothing to hide.

Q. *OK but you don't want to, you don't want to answer our questions without an attorney present now?*

A. *You know, I'll answer a certain amount, you know.*

Q. *OK you know you have the right to stop at any time. That's what's on there.*

A. Where do I sign at.

(Emphasis added.)

■ We note that Kyger eventually signed waiver of rights documents and answered his interrogators' questions. The law is well settled that a suspect must be informed of his right to remain silent and his right to counsel. He may not be interrogated until he waives those rights. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If at any time the suspect invokes his right to counsel, all questioning must cease until the suspect consults with counsel or initiates contact with his interrogators. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981).[1]

■ If an accused's request for counsel is equivocal or ambiguous, however, police may only attempt to clarify the suspect's desire for counsel. *United States v. Fouche,* 833 F.2d 1284, 1287 (9th Cir.1987); *Nash v. Estelle,* 597 F.2d 513 (5th Cir.1979). The state contends the facts in this case fall within this exception. We disagree.

In *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), the Supreme Court considered the ambiguity of a defendant's initial request for counsel. After being informed of his right to have counsel present, Smith stated, "Uh yeah. I'd like to do that." *Id.* at 93, 105 S.Ct. at 491. The Supreme Court held that the request was unambiguous; "[r]esponses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." *Id.* at 92, 105 S.Ct. at 491.

■ Similarly, Kyger's comment that he would "just as soon have an attorney" must be reviewed to determine its ambiguity; if not ambiguous, his subsequent responses may not be considered.

The statement, on its face, was not equivocal; it was in direct response to the officer's inquiry as to whether he would answer questions in the absence of counsel. Kyger's explanation, "that's a serious charge," underscores the clarity of his intent.

Whether Kyger's request was equivocal, however, is completely controlling on this issue. Even if his request for counsel had been ambiguous, the continuation of the November 14th interrogation was, in our assessment, improper. While police may clarify a suspect's equivocal request, "this is not to say that an interrogating officer may utilize the guise of clarification as a subterfuge for coercion or intimidation." *Nash,* 597 F.2d at 517–518. The officer who persisted in the questioning provided the gentle nudge necessary for Kyger to proceed without the benefit of counsel. While "intimidation" may be too strong a term, the effect was the same. We believe the action was impermissible.

The manner of questioning in this instance was, in fact, similar to the very technique prohibited in *Miranda* 384 U.S. at 454, 86 S.Ct. at 1617. We must conclude that, even if the request was equivocal, the

---

1. At the time of this interrogation, the defendant, although in custodial arrest, had not been formally charged; therefore, only his fifth amendment rights rather than his sixth amendment right to counsel were implicated. *See Michigan v. Mosely,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

statement that "if you ain't got nothing to hide … you'll answer our questions," was in excess of the officer's authority. We do not interpret the comment as an effort to clarify Kyger's request for counsel.

■ Having determined that Kyger's interrogation beyond that point was improper, the critical question becomes whether the fifth amendment violation, in this instance, constitutes harmless error.

The test is whether the evidence complained of is harmless beyond any reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). There must be no "reasonable possibility that the evidence complained of might have contributed to the conviction." *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). Some authorities suggest that when a fifth amendment violation is established, a subsequent confession must be found "voluntary under the totality of the circumstances" in order to qualify as harmless. *See, Harryman v. Estelle*, 597 F.2d 927 (5th Cir.1979); *Smith v. Estelle*, 527 F.2d 430 (5th Cir.1976); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 827–828, n. 8, 17 L.Ed.2d 705 (1967). Measured by this standard we find the error harmless in this instance.

The harmlessness of the error in this case, we believe, is best illustrated by the exculpatory nature of Kyger's answers to questioning on both November 14th and November 24th. In response to his various interrogations, Kyger stated that he worked all day on the afternoon of the offense and did not leave Hammer's Automotive until about 4:45 P.M. Jason Riley was still there when he left. Hammer had been at the business location earlier but not the entire day. Kyger said he got lost as he walked to "Bo Hill's house." He admitted that he drank a pint of beer during the last two hours he was at the shop. Kyger

denied any involvement in the robbery. He stated that he was never in the pickup truck and did not go to the IGA. He explained that his pants were wet from having walked through a yard. He said that he did not wear a coat or hat the entire day of the murder.

During his initial November 14th statement, Kyger consented to fingerprint, handswab, and clothing analysis. His boots contained water. Kyger ultimately authorized a search of the bedroom he occupied at the Hammer residence. On November 24th, Kyger told officers he had washed his hands and wore clean clothes when he left work; he had not shot a gun since his arrival in Tennessee two weeks earlier. He said that coveralls he borrowed from Ms. Hulse were in Virginia. Kyger argues that all this evidence was inadmissible because it flowed from the fifth amendment violation.

While Kyger's statements certainly do not qualify as confessions,[2] it is true that certain of his comments conflicted with the physical evidence, i.e., the gunshot residue test was positive and the coveralls were found in the area where one of the robbers fled; they linked Kyger with Hammer and placed Kyger within the general vicinity of the crime. Absent comparison to other evidence (all of which we deem admissible), however, they were not facially incriminating. Despite the fifth amendment violation and under all of the circumstances, we believe any admissions within his initial statement were voluntary; any error by its introduction was harmless. In fact, the defense may have actually enjoyed an advantage by its admission into evidence. Because it was primarily exculpatory,[3] the jury was provided Kyger's explanation of the circumstances without the possibility of direct cross-examination. Although a difficult assessment, we nonetheless conclude

---

2. "An admission is an acknowledgment by the accused of certain facts which tend together with other facts, to establish his guilt; while a confession is an acknowledgment of guilt itself. An admission, then, is something less than a confession and, unlike a confession, putting to one side the problem of corroboration, an admission is not sufficient in itself to support a conviction. 3 Wharton's Criminal Evidence

(13th ed. Torcia 1973), §§ 662 and 663." *Helton v. State*, 547 S.W.2d 564, 567 (Tenn.1977).

3. The state may use a freely given statement of an accused when it is not otherwise admissible because of its self-serving nature. *State v. Williams*, 657 S.W.2d 405, 412 (Tenn.1983).

that the November 14th statement was, in the totality of the circumstances, voluntary; therefore, the constitutional violation was harmless beyond any reasonable doubt.

■ Kyger's consent to fingerprints, photographs, handswabs, and the residential search was not vitiated by the earlier fifth amendment violation. Evidence derived from an uncoerced confession illegally obtained through such a violation may be admissible notwithstanding whether the confession was or should have been suppressed. *State v. Story*, 608 S.W.2d 599 (Tenn.Crim.App.1980); *See Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

In *United States v. Lemon*, 550 F.2d 467 (9th Cir.1977), the court held that while a consent to search must be voluntary, its fruits are not tainted by a fifth amendment violation:

> It is not in itself "evidence of a testimonial or communicative nature" under *Schmerber v. California*, 384 U.S. 757, 761–764, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966).... Hence, because there was no questioning implicating appellant's fifth amendment rights, and therefore no violation of *Miranda*, in the elicitation of the consent, we need not decide whether the "fruits" doctrine of *Wong Sun* [v. U.S., 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ] applies to *Miranda* violations.

*Id.* at 472.

The Fifth Circuit has similarly held that a consent to a search is not an incriminating statement; it is not, therefore, excluded solely on the basis of a fifth amendment violation. *See Cody v. Solem*, 755 F.2d 1323 (5th Cir.1985). In *Cody*, the defendant's consent to search was given after he had requested counsel.[4] The court held that any violation must be considered in determining the voluntariness of the consent given in view of the totality of the circumstances. *Id.* at 1330.

■ These circumstances demonstrate the voluntariness of Kyger's consent to search, despite the fifth amendment violation. In addition to the factors already considered in evaluating the voluntariness of Kyger's statement, the following circumstances also reflect upon the issue of consent to search:

> (1) his statement was not incriminating; the information provided by Kyger did not color the subsequent investigation;
>
> (2) Kyger had been re-advised of his rights and given a repetitive statement before his consent; and
>
> (3) no coercive promises were made to Kyger; he was told only that if the tests were negative he would be cleared from suspicion.

We must conclude that the consent was voluntary and any evidence obtained in the search would have been admissible. We also note that the search in question did not, in fact, provide any evidence that was admitted at trial. The black jacket found in the search of Kyger's room was never introduced as proof. Had any error been committed, it would have been harmless.

Defendant also contends that as a result of the November 14th fifth amendment violation, his statement given on November 24th should also be suppressed. The state response is that because the defendant was not in custody on November 24th, fifth amendment rights do not apply. Neither party cites any case law to support their argument.

Our research indicates that there are several cases outside of this jurisdiction, dealing with the issue of whether fifth amendment protection extends to interrogations occurring after the defendant has been released from continuous custody. *See United States v. Skinner*, 667 F.2d 1306 (9th Cir.1982); *Dunkins v. Thigpen*, 854 F.2d 394 (11th Cir.1988); *People v. Trujillo*, 773 P.2d 1086 (Colo.1989); *State v. Norris*, 244 Kan. 326, 768 P.2d 296 (1989); *State In Interest of Wells*, 532 So.2d 191 (La.App.

---

4. The court also held that Cody's sixth amendment rights were not violated; he was given the opportunity to consult with an attorney.

1988); *Brown v. State,* 661 P.2d 1024 (Wyo.1983). We find them instructive.

■ In each of these cases the various Courts held that the previous request for counsel did not preclude further questioning when the defendant had been released from continuous custody. In *Dunkins,* the 11th Circuit distinguished this situation from *Edwards:*

> [A] break in custody dissolves a defendant's *Edwards* claim. If the police release the defendant, and if the defendant has a reasonable opportunity to contact his attorney, then [there is] no reason why *Edwards* should bar the admission of any subsequent statements. A break in custody after the invocation of fifth amendment rights ends the need for the *Edwards* rule.

*Dunkins,* 854 F.2d at 397.[5]

After his release from custody on November 14th, the defendant had substantial opportunity to consult with counsel before the November 24th encounter; thus, the *Miranda–Edwards* taint had dissipated with the passage of time. Because his release was not a pretext used to circumvent Kyger's constitutional safeguards, police were free to reinitiate contact and investigate further.

Although there was some confusion over whether the second statement was made on November 21 or November 24, it appears to have been on the latter date. In the second interrogation, Kyger said he had washed his hands before leaving work on the date of the robbery. He stated that he had not fired a gun since he arrived in Murfreesboro some two weeks before the offenses. He told officers that Ms. Hulse's coveralls were in Virginia. The statements, in our judgment, were incriminating only to the extent that they conflicted with other evidence. They were apparently made in Hammer's residence. Because of the time lapse between the *Miranda* viola-

tion and the second statement, its exculpatory nature, and the likelihood the defendant was not in custody during questioning, we find no error on this issue.

In summary, we find that the conduct of the officers during the initial questioning on November 14th violated Kyger's *Miranda* rights. His statements on that date, however, were exculpatory, voluntary under the totality of the circumstances, and harmless beyond a reasonable doubt. The physical evidence was admissible. Kyger's consent to search was not vitiated by the fifth amendment violation. The violation did not render the November 24th statements inadmissible.

## V

■ Kyger also claims that he was not taken "without unnecessary delay before a magistrate or judge ..." as required by Tenn.R.Crim.P. 5(a). He argues that this fact necessitates the suppression of his November 14th statement. *See State v. Haynes,* 720 S.W.2d 76 (Tenn.Crim.App. 1986); *State v. Browning,* 666 S.W.2d 80 (Tenn.Crim.App.1983).

In *State v. Readus,* 764 S.W.2d 770, 774 (Tenn.Crim.App.1988), this court distinguished between Rule 5(a) of the Tennessee rules and its federal counterpart, Fed. R.Crim.P. 5(a):

> Certainly a violation of Rule 5(a) could result in the suppression of a confession, if the violation was a factor in its involuntariness. The better reasoned cases interpreting "unreasonable delay" in this context say that it is one factor to be taken into account in evaluating the voluntariness of a confession; and that if the totality of the surrounding circumstances indicates that a confession was voluntarily given, it shall not be excluded from evidence solely because of delay in carrying the confessor before a magistrate.

---

5. The court in *Dunkins* specifically limited their holding to cases where the break in custody was not contrived or pretextual. *Id.,* n. 6. Similarly, in the case at bar there is no contention that the defendant's release was contrived or used as a pretext as a method of avoiding his request for counsel, nor is there evidence in the record supporting this theory. Since the police officers obviously did not recognize defendant's request as an invocation, they had no reason to circumvent his effect.

In this instance, Kyger gave his statement within a few hours of his November 14th arrest. It was not incriminating. Probably because the gunshot residue test results were not yet available, Kyger was released. In *State v. Browning*, 666 S.W.2d 80 (Tenn.Crim.App.1983) the defendant was released without being charged after his first interview; because he was taken before a judge immediately after additional questioning ten days later, the court found no Rule 5 violation.

In our view, Kyger was unconditionally released after his initial interrogation. *See State v. Best*, 614 S.W.2d 791 (Tenn.1981). Rule 5 does not apply. The November 14th statements were nonetheless entirely exculpatory. There was no confession; Kyger did not incriminate himself. The admission of the initial statements did not affect the verdict. Tenn.R.App.P. 36(a).

This issue is without merit.

### VI

On November 17th, police officers searched the Hammer residence. At the suppression hearing, Hammer testified that this search occurred without either a search warrant or his consent. Agent Wix testified that Hammer consented to a search of his vehicle and his house. The trial court found Hammer had, in fact, given his consent.

■ The findings of the trial court on a motion to suppress have the weight of a jury verdict and will not be reversed unless the evidence preponderates against them. *State v. Tate*, 615 S.W.2d 161 (Tenn.Crim. App.1981). The evidence does not preponderate against the finding of consent.

\* \* \*

■ Lastly, defendant contends that his rights were violated when officers failed to inform him of his *Miranda* rights before eliciting his statement that he might be "up to his neck in it."

This statement occurred at Hammer's home on November 21st, when Special Agent Danny Wix questioned the defendant and his wife at their residence. The officers admitted they did not advise defendant of his *Miranda* rights.

*Miranda* rights are only required prior to custodial interrogation. *See State v. Morris*, 224 Tenn. 437, 456 S.W.2d 840 (1970). Hammer was not in custody at the time he made the remark. He was at his home with his wife. There is no indication that the defendant was not free to leave. Under these circumstances, we do not believe officers were under an obligation to advise Hammer of his rights.

This issue is without merit.

### VII

■ A photograph depicting two bullet wounds to the victim's chest was admitted into evidence. Kyger argues that because the cause of death was not at issue, the picture was admitted to inflame the jury.

The admission of photographs rests within the sound discretion of the trial court. *State v. Melson*, 638 S.W.2d 342 (Tenn. 1982); *State v. Banks*, 564 S.W.2d 947 (Tenn.1978). The photograph must be relevant and its probative value must outweigh its prejudicial effect. *Banks*, 564 S.W.2d at 952.

The photograph in this case was not particularly gruesome. It primarily depicts the location of the wounds. It was relevant to prove the circumstances of the offense. In our view, its probative value outweighed any prejudicial effect.

This issue is without merit.

### VIII

The defendant Hammer complains that the prosecutor was guilty of misconduct and that the trial court denied him due process of law.

■ Before trial, the court ordered both parties to provide copies of any statements of any witnesses after their testimony on direct. During Hammer's presentation of proof, the state complained that he had not furnished these statements. The following exchange then occurred in the presence of the jury:

THE COURT: You were under court order to submit that earlier.

MR. ANGLIN: Your Honor, our understanding was that after that witness testifies, that the statement is then given to the State to review, and we've done that.

THE COURT: You were ordered to furnish that to the State earlier.

MR. ANGLIN: I don't recall that, your Honor.

GEN. DOTSON: Your Honor, the only thing we're complaining about is that we would like to review this statement, and we would like for Mr. Anglin to wait until it's his time to question Mr. McElroy again, and then he can get up there and do all the testifying he feels like he wants to do.

THE COURT: No, he can't testify. He can ask all the questions he wants to ask.

MR. GREEN: Your Honor, may be approach the bench.

In a subsequent bench conference, the confusion was cleared. The trial court then gave the following curative instruction, at defendant's request:

> The Court wants to instruct you to disregard my obvious irritation with Mr. Hammer's attorneys. They didn't do anything improper, and they didn't violate the spirit of the Court's order. Of course, the Court's intent was that all these statements all be exchanged prior to trial date so we wouldn't have delays, but I should not have become irritated with them, or if I became irritated, I shouldn't have shown you that I was irritated. Again, of course, you are to decide this case solely on the proof from the witness stand and the law and not anything about the attorneys or anything the Court might do. So I do ask you to disregard that irritation.

Any prejudice caused by the trial court's statement was cured by the instruction. Juries are presumed to follow the trial court's instruction. *State v. Blackmon*, 701 S.W.2d 228, 233 (Tenn.Crim.App.1985).

■ Hammer also complains of a comment made by the trial court after a state objection. The comment was intended to clarify any confusion surrounding the pur-

pose of the objection. In our view, the explanation had no effect in the results of this trial.

Hammer also complains of several other remarks made by the trial court in response to objections during closing argument. For example, defense counsel stated that the attorney general was the sheriff's boss and "prosecutor for the Sheriff's Department." The state objected and the trial court sustained the objection. Because the characterization was indeed incorrect, the trial court properly sustained the state's objections. The action was proper.

■ When Hammer made an objection that the prosecutor's statement was not based upon the evidence, the trial court noted that "the jury will remember what the proof was." We view this instruction as properly instructing the jury to rely upon their own recollections of the evidence. We do not believe that the trial court's action in any way endorsed the state's argument, as the defendant suggests.

Hammer also objected during the state's argument that it did not receive a particular witness' statement in advance of trial. In context, this was not improper. The comment was in response to the defendant's argument that the state had notice of those witnesses prior to trial and had still failed to impeach their testimony. In our view, the state was justified in its attempt to answer the allegation.

■ Finally, Hammer complains that the state was guilty of misconduct during closing argument. In response to the defendants' assertion that Sharon Hammer could not have driven the two defendants in her two passenger vehicle to the location of the stolen pickup truck, the prosecutor stated as follows:

> Oh, but Mrs. Hammer couldn't have taken them over there because she's only got a two-seater car, a Datsun-the same type of car that Mr. Hammer and Mr. Kyger rode up to Virginia Hulse's house in Virginia with two or three other people when the truck broke down. It can happen in Virginia because you cross

that state line, it's magic. But down here that can't happen? Sure it can. Virginia Hulse testified that Kyger along with three or four other people drove to her house in a 260 Datsun. Hammer argues that the argument was not supported by the evidence and accused defense counsel of lying. This dispute was an attack upon the logic of the defense argument, not its veracity. Upon objection, the trial court reminded the jury to rely upon the proof and not the argument.

In our view, neither the conduct of the prosecutor nor the commentary of the trial court prejudiced the defense.

This issue is without merit.

## IX

Both defendants question the propriety of jury instructions given by the trial court on flight, admissions against interest, aiding and abetting, and fingerprint evidence. Hammer also complains that the jury instructions unfairly coupled him with Kyger.

The jury was provided the following instruction on flight, T.P.I.—Crim. 37.16

**Flight.** The flight of a person accused of a crime is a circumstance which, when considered together with all the facts of the case, may justify an inference of guilt. Flight is a voluntary withdrawal of one's self for the purpose of evading arrest or prosecution for the crime charged.

Whether the evidence presented proves beyond a reasonable doubt that the Defendants fled is a question for your determination. The law makes no nice, refined distinction as to the manner or method of a flight. It may be open, or it may be a hurried or concealed departure, or it may be concealment within the jurisdiction. However, it takes both a leaving of the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the Defendants are guilty of the crime alleged. However, since flight by a Defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all the other evidence when you decide the guilt or innocence of a Defendant.

On the other hand, an entirely innocent person may take flight, and such flight may be explained by proof offered or by the facts and circumstances of the case. Whether there was flight by the Defendants, the reasons for it, and the weight to be given to it, are questions for you to determine.

Because there was no evidence either defendant fled the scene of crime, they claim the instruction was improper.

A minority of the states have either done away with or limited the instances in which the jury is charged on the law of flight. *See,* for example, *State v. Jefferson,* 11 Wash.App. 566, 524 P.2d 248, 251 (1974); *U.S. v. Telfaire,* 469 F.2d 552 (D.C.Cir. 1972); *U.S. v. Robinson,* 475 F.2d 376 (D.C. Cir.1973). In *State v. Humbolt,* 1 Kan. App.2d 137, 562 P.2d 123 (1977), the court of appeals held that the weight to be given any evidence of flight is a matter for counsel to argue and for the jury to determine. Oregon and Colorado have apparently adopted this rationale. *People v. Larson,* 194 Colo. 338, 572 P.2d 815 (1977); *State v. McCormick,* 280 Or. 417, 571 P.2d 499 (1977). Idaho and Colorado hold that the instructions should be given only when the trial court determines that the charge is absolutely essential under the particular facts of the case. *State v. Wrenn,* 99 Idaho 506, 584 P.2d 1231 (1978); *Robbins v. People,* 142 Colo. 254, 350 P.2d 818 (1960). This trend appears to be the result of several cases which indicate that flight from arrest often bears little, if any, relationship to the guilt of the accused.[6] *See Telfaire,* 469 F.2d at 557; *Robinson,* 475 F.2d at

---

**6.** In *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, n. 10, 9 L.Ed.2d 441 (1963), the Supreme Court observed that it had "consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime."

384. Tennessee subscribes to what we deem the majority view.

In *Hall v. State*, 584 S.W.2d 819 (Tenn. Crim.App.1979), this court cited 29 Am.Jur. *Evidence*, § 280 at 329 on this issue:

> The fact that a defendant after the commission of a crime concealed himself or fled from the vicinity where the crime was committed, with knowledge that he was likely to be arrested for the crime or charged with its commission, may be shown as a circumstance tending to indicate guilt.

Earlier, in *Rogers v. State*, 2 Tenn.Crim. App. 491, 455 S.W.2d 182 (1970), this court adopted the view set out in 22A C.J.S. *Criminal Law* § 625 on this subject:

> The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

As recently as *State v. Whittenmeir*, 725 S.W.2d 686 (Tenn.Crim.App.1986), this court cited the language with approval. In appears, therefore, that the pattern instruction is more closely aligned with the *Rogers-Whittenmeir* standard rather than with the rule in *Hall.*

■ In this instance, we believe that the jury could have properly applied the law on flight. The perpetrators obviously left the scene of the crime; their identities were concealed. The defendants were able to evade authorities because, after the removal of their disguises, they could not be recognized by eyewitnesses. This, in our view, meets the two-pronged test which triggers the charge.

A few minutes after the robbery/murder, certain eyewitnesses saw a man matching Kyger's description running through traffic away from the scene. He almost caused an accident. That Kyger was later seen dressed in different clothing walking towards the scene is not relevant. When jurors determined that it was Kyger who fled the scene, their next determination was whether he, by his change of clothing, was either concealing himself or evading authorities. Although the facts differ somewhat as to Hammer, we think the same rationale applies. There was circumstantial proof that he drove the getaway truck; his identity was also concealed. We believe it was proper for the jury to consider the inference of guilt.

As the state suggests, the inference provided little assistance to the prosecution under these particular circumstances. "Whether the flight was by [these] defendants" required a factual determination that the defendants were actually the perpetrators before any inference could be drawn. There was never any question that the two men who fled the scene robbed and murdered the victim. While the charge may have been surplusage, it was not reversible error.

■ The jury was also instructed on admissions against interest:

> **Express admissions against interest.** Evidence of admissions have been introduced in this case. An admission is an acknowledgment by a defendant of certain facts which tend, together with other facts, to establish his guilt. An admission is not sufficient in itself to support a conviction. It must be corroborated by other independent evidence to warrant and support a conviction.
>
> The Court has permitted introduction of this evidence, but it remains your duty to decide if in fact such statements were ever made. If you do not believe they were made, you should not consider them. If you decide the statements were made, you must then judge the truth of the facts stated. In determining whether statements are true, you should consider the circumstances under which they were made. You should also consider whether any of the other evidence before you tends to contradict the statements in whole or in part. You should not arbitrarily disregard any part of the state-

ment, but should consider all of the statements you believe are true.

If you find the statements are true, you are the sole judge of the weight that should be given them. You should consider it along with all other evidence in the case in determining a Defendant's guilt or innocence.

*See* T.P.I.—Crim. 37.07.

Both defendants made "acknowledgments of certain facts which tended *together with other facts,* to establish his guilt." (emphasis added.) Hammer stated that he might be "up to his neck in it, but I didn't do it"; Kyger admitted that he had been loaned a pair of blue coveralls (which were found behind the apartments). The first statement might have been construed as an admission of limited participation in the offenses but a denial that he took the money or shot the victim. This interpretation was consistent with the state's theory that Hammer drove the getaway vehicle. The fact contained in the second statement was also established through another witness; it connected Kyger to the scene to which the gunman fled. Because the instruction specifically stated the jury's responsibility in deciding the value of the statements as admissions, we do not view the instruction as erroneous.

■ Hammer objected to the trial court's instruction to the jury on aiding and abetting. He argues that the only proof tying him to the crime were the fingerprints found in the stolen vehicle; he contends that there was no proof that the prints were left during the commission of the offense.

The proof was that the taller, thinner perpetrator drove the getaway truck. The shorter, stockier perpetrator took the money and shot the victim. Hammer's fingerprints and police scanner were found inside. The description of the driver generally matched Hammer's physical appearance. The state successfully refuted Hammer's explanation for the presence of both his prints and his scanner. There was sufficient circumstantial evidence to support the state's theory that Hammer drove the truck. His participation could have been as

an aider and abettor. The trial court was, in our view, correct in giving this instruction.

■ The jury was also charged with T.P.I.-Crim. 37.15; in order for fingerprint evidence alone to sustain a conviction, the jury must determine that the fingerprints could only have been impressed during the commission of the crime. Hammer claims the instruction permitted the jury an improper "inference upon an inference," i.e., if the jury might infer Hammer's guilt of the theft of the truck by the presence of his fingerprints, could the jury then infer that the defendant was an aider and abettor in the robbery and murder?

We disagree. There was other evidence besides the fingerprint identifying Hammer as the perpetrator of this crime; the jury did not have to rely upon fingerprints alone. The prints were found in an area accessible to the driver of the vehicle. Hammer fit the description of the driver as given by eyewitnesses to the crimes. There was no reliance by the state on the permissible inference from possession of recently stolen property.

Hammer argues that the instructions unfairly joined or coupled him with defendant Kyger. He specifically submits that the instructions on flight, admissions and circumstantial evidence should have been limited to Kyger.

■ When multiple defendants are tried jointly, and evidence is admitted against one defendant but not another, the jury should be instructed accordingly. In this case, the trial court instructed the jurors that each defendant should be given separate consideration, along with the evidence against each one. The fingerprint and alibi evidence were specifically limited to defendant Hammer. The gunshot residue evidence was specifically limited to defendant Kyger.

The evidence supports jury instructions of flight and admissions against interest. As indicated, each charge related to certain evidence against each defendant. There was no need, in our opinion, to emphasize to the jury the particular facts as to each

defendant which triggered the charge. The circumstantial evidence instruction was equally applicable to both. In fact, the state's case rested entirely upon circumstantial proof. Because such cases require closer scrutiny by the fact finder, the charge could not have prejudiced Hammer.

This issue has no merit.

X

 The defendants claim the trial court erred by its failure to provide jury verdict forms which recognized a "hung jury" as an option in their possible verdicts.

We note that the defendants rely upon *United States v. Arpan*, 861 F.2d 1073 (8th Cir.1988). In *Arpan*, the jury sought instructions from the court on how to record a split decision on the verdict form. The trial court's response was that they could only return a unanimous verdict. After further deliberations, the trial court provided the *Allen* [7] "dynamite" charge. The Eighth Circuit found these instructions to be erroneous.

*Arpan* is distinguishable upon the facts. The jury was instructed in accordance with the ABA standards approved in *Kersey v. State*, 525 S.W.2d 139, 144 (Tenn.1975). This charge clearly instructs jurors not to surrender individual opinions for the sole purpose of returning a verdict. The hung jury, by inference, is an option.

As the state notes, the "hung jury" is not actually a verdict; instead, it signals the jury's failure to reach a decision. There is no indication in this record that the jury was unable to reach a unanimous verdict. There is nothing to suggest the jury was in any way frustrated by the assumption anything less than a unanimous verdict was prohibited.

This issue is without merit.

The judgment of the trial court is affirmed.

DUNCAN and BIRCH, JJ., concur.

---

**7.** *Allen v. U.S.*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).