# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 8, 2001 Session

## STATE OF TENNESSEE v. WHEATLEY JAMAR GRAHAM, III

**Appeal from the Circuit Court for Madison County**
**No. 99-187      Roger A. Page, Judge**

_____

### No. W2000-01723-CCA-R3-CD  - Filed July 19, 2001

_____

After a jury trial, Defendant, Wheatley Jamar Graham, III, was convicted of two counts of attempted first degree murder, three counts of aggravated assault and possession of a weapon in commission of a felony.  Defendant was sentenced to twenty-four (24) years incarceration as a Range I offender for two counts of attempted first degree murder, 4.5 years incarceration for three counts of aggravated assault and 1.9 years for possession of a weapon in the commission of a felony.  The trial court ordered all sentences to be served concurrently, but merged two counts of aggravated assault with the two counts of attempted first degree murder.  In this appeal as of right Defendant contends: (1) the evidence is insufficient to convict Defendant of attempted first degree murder in counts 3 and 4 of the indictment; (2) whether the trial court erred by permitting the State to introduce evidence that Defendant refused to permit law enforcement officers to obtain a "hand swab" from him; and (3) whether the trial court erred in not dismissing Defendant's convictions for aggravated assault in counts 7 and 8 instead of merging these convictions with counts 3 and 4, attempted first degree murder, as being in violation of the prohibition against double jeopardy.  We conclude that the evidence in this record supports Defendant's convictions for attempted first degree murder, and that the trial court did not abuse its discretion by ruling Defendant's refusal for hand swabs was admissible and the trial court's merging of the two counts of aggravated assault with the attempted first degree murder conviction was not double jeopardy.  Thus, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

L. TERRY LAFFERTY, SR. J., delivered the opinion of the court, in which DAVID H. WELLES, J., and ALAN E. GLENN, J., joined.

Scott G. Kirk, Jackson, Tennessee, for the appellant, Wheatley Jamar Graham, III.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; and Shaun A. Brown, Assistant District Attorney, for the appellee, State of Tennessee.

# OPINION

At trial, Torrianto Brown, testified he worked the 7:00 p.m. to 7:00 a.m. shift at the Owens-Corning plant in Jackson, Tennessee, on December 5, 1998. About 7:00 p.m., Brown saw Craig Rogers in the plant arguing with Gene Taylor. Between 9:00 and 9:30 p.m., Brown, James Carter and Michael Willingham were leaving the plant for their lunch break. Brown saw Craig and Billy Rogers coming in the plant. Outside the plant door, Brown saw Defendant standing, and said, "Hello" to him. Brown had never seen Defendant before that night. As the three were going to Brown's '85 gray ninety-eight in the parking lot, Brown heard a gunshot from the plant. Brown saw the Rogers brothers and Defendant get into a white car driven by Craig. Brown stated that Michael Willingham was in the right front passenger's seat and James Carter was in the rear. At the stop sign of the parking lot, Craig flashed his lights and pulled up beside Brown's window. Billy pulled a black Glock-like pistol and shot Brown in the left shoulder. As Brown slumped over, he stated he saw Defendant open the passenger door and shoot Michael Willingham point blank, then Defendant opened the rear door and shot into the back seat.

Brown took off in his car, and was pursued by the white car, which fired some shots at his vehicle. On the by-pass, Brown wrecked his car in the median. Brown described the damage to his car which consisted of three bullet holes in the front window, the back window was shot out, the driver's side window was shot out, and the back driver's side window was shot out.

Michael E. Willingham, testified that he worked the 7:00 p.m. to 7:00 a.m. shift at the Owens-Corning plant on December 5, 1998. Willingham stated he was with Torrianto Brown and James Carter that night, but after he was shot in the head he could not remember anything about the shooting. Also, the victim was shot in the right elbow and the bullet is still lodged in his head. The victim spent seven (7) weeks in the hospital and received serious injuries that will prevent him from working.

James Carter testified that he was at work on December 5, 1998, at the Owens-Corning plant when he saw Craig and Billy Rogers outside the plant, as he, Torrianto Brown and Michael Willingham were leaving for their lunch break. Defendant, whom he had never seen before, was outside the plant door. Craig and Billy went in the plant while Defendant remained outside. Carter got into the rear of Brown's car and Willingham was in the right front seat. As they were leaving the parking lot, Craig and Billy pulled along side of them. Billy put a gun in Brown's face and Defendant got out of the car, opened the front right door and shot Willingham in the head. Then, Defendant opened Carter's door and shot him four times, striking Carter twice in the hip, once in the left thigh, and in the back area. Carter believes that Billy shot him in the left arm. Carter stated they headed for the hospital, with Craig and Billy chasing them and firing additional shots at the car. On the by-pass, Brown drove into a ditch. Carter then ran into the middle of the street trying to get help. The victim spent three days in the hospital and two bullets were removed from his body. It was Carter's understanding that Craig had gotten into an argument with the team leader, "Greg."

Craig Rogers testified that he entered three pleas of guilty to attempted first degree murder and he was serving a fifteen (15) year sentence for each offense concurrently. On December 5, 1998, Craig stated that he had a disagreement with Greg Taylor, a team leader, at Owens-Corning. Prior to his encounter with Taylor, Craig had been home consuming about four beers, a pint of Canadian Club whiskey, one and a half quarts of Icehouse beer, and three quarters of a forty-ounce Bud Light beer. His brother, Billy, was at Defendant's home and they drank some more beer when Craig told Billy about his problems with Taylor. They and Defendant got into Craig's white Corsica and went to the plant. Craig and Billy went inside and Craig got into a fight with Taylor. Billy had given Craig a .40 caliber Glock pistol. While going inside, the three victims passed by and Defendant remained outside. Billy and Walter Ross began struggling over the pistol, and it fired. Craig stated that he and Billy left, and he was not paying attention to Defendant, got into his car and flashed his lights at Brown to stop. Craig pulled up beside Brown and was talking to him when Craig heard some shots being fired on Brown's opposite side. After these shots, Billy began firing with the Glock and Craig told him to stop. Craig did not see Defendant get back into his car, nor did he see Defendant with a gun, but he did see Defendant on the passenger's side of Brown's car. Craig stated that he went to his mother's home and Defendant went home. Craig testified that he called the police. Craig stated that Billy gave Defendant a .380 Lorcin chrome pistol while inside the car.

Jean Chism Lawrence, a security guard at the Owens-Corning plant, testified she received a phone call from a man who said that he had been pistol-whipped in the plant. She heard a gunshot from the plant. She estimated the time to be approximately 9:40 to 10:00 p.m. She observed a car coming to the gate and she let it out, then another car shot by her, pulling up beside the other car, and she heard some shots coming from the second car. She then called the police.

John Cole, a pawnshop owner, testified that on June 5, 1998, he sold a Lorcin L380, .380 caliber pistol to Billy Rogers' wife. On August 17, 1998, Cole sold a Glock Model 22, .40 caliber pistol to Billy Rogers.

Officer Terry Halford, with the Jackson Police Department, testified that he received a broadcast at approximately 10:30 p.m. to the home of Craig and Billy Rogers about a shooting. Officer Halford arrested both Rogers brothers. From Craig's white Corsica, he recovered a .380 Lorcin pistol, some .380 magazines for this pistol, some .40 caliber ammunition and a Glock 22 .40 caliber pistol.

Lieutenant Michael Holt, with the Jackson Police Department, testified he received a phone call from Craig Rogers stating he and Billy were involved in the shooting. Holt stated this information was consistent with what he had learned at the scene. Lieutenant Holt sent an officer to arrest Craig and Billy. After talking to Craig and Billy, Defendant was developed as a suspect. Also, Lieutenant Holt had obtained hand swabs from Craig and Billy for gunshot residue evidence. Lieutenant Holt stated that he saw Defendant at 5:15 a.m. on December 6, 1998, at Defendant's residence. Lieutenant Holt requested Defendant to give hand swabs for a gunshot residue test, but Defendant refused.

During recall, Lieutenant Holt testified that he gave gunshot residue tests to Craig and Billy Rogers. The tests showed that Craig had not fired a weapon, but Billy had. During cross-examination, Lieutenant Holt testified that he "notified the District Attorney General's office that Defendant refused to consent to a gunshot residue test and that a significant amount of time had elapsed after his arrest . . . it may have been inconclusive because of eight hours had elapsed." Lieutenant Holt identified a fax sent to the District Attorney General's office that stated no gunshot residue test was done on Wheatley Graham because of the time that had elapsed after his arrest.

Teri Arney, a forensic scientist with the Tennessee Bureau of Investigations, testified as a firearms examiner. She stated she received from the Jackson Police Department, two pistols, a Glock 22 .40 caliber and a .380 Lorcin pistol. Also, accompanying the pistols were an assortment of .380 ammunition, magazines, spent hulls and bullet fragments. As a result of her examination, Agent Arney testified that the bullet fragments and copper jacket fragments, as well as cartridges found at the scene and recovered from the victims, were fired from the .380 Lorcin pistol. Also, the .40 caliber cartridges found at the scene of the shooting were associated with the Glock 22 .40 caliber pistol, but she could not say conclusively they were fired by the Glock.

Jimmy Lee Cannon, father of Cynthia Graham, testified he was living at 236 Phillips Street in Jackson, Tennessee, on December 5, 1998. Defendant came by the house earlier that day, at approximately 4:30 p.m., to pick up $20 owed to him by Cannon. Cannon stated Defendant returned between 9:00 to 10:00 p.m. and they were watching a football game on television. During the evening, Defendant and Andre Long left to get some beer at a local market. Cannon knows Defendant was there between approximately 9:00 to 10:00 p.m. because he was waiting for the news to come on televison.

Gloria James, known as "Lucy," testified she was a good friend of Cynthia Graham, who was dating Defendant. James stated she went to Cannon's house between 9:30 to 9:45 p.m. She saw Defendant who asked her to take him to the store for some beer, but she refused. She was waiting for her boyfriend so they could go out to eat. The men were watching a football game on television. She left at aproximately 9:45 p.m.

Cynthia Graham testified that she and Defendant have lived together for thirteen (13) years and they have three children together. On December 5, 1998, Billy Rogers came by their home. Defendant and Billy left for the store and then to go to her father's home to watch a football game. Her father owed Defendant ("Pete") some money. Defendant and Billy returned with four quarts of beer and watched the game. Ms. Graham stated she went to Billy's sister's home. She remained there until they heard on the scanner about Craig and Billy. They went to Craig's mother's home when Billy and Defendant arrived between 9:00 to 9:30 p.m. Ms. Graham stated Defendant was supposed to be home baby-sitting their children. She next saw Defendant at approximately 11:00 p.m. at her father's home.

On his own behalf, Defendant testified that he and Cynthia Graham lived at 305 Circle Drive. He had known Billy Rogers for some time and they were good friends. On December 5, 1998, Billy

came by his home between 6:15 and 6:30 p.m. They finished a quart of beer and then went to the store for some more beer. They stopped at Jim Cannon's house for about 15 minutes. When they returned to Defendant's home on Circle Drive, Cynthia had gone to Carolyn's house, Billy's sister. Defendant stated they watched a game on television. Craig came by and he had a guy with him named "Melvin." Craig and Melvin left and Craig returned about 10 minutes later. Craig and Billy were leaving, so Defendant asked Craig to drop him off at Cannon's house. Billy had asked Defendant if he could leave his car at Defendant's house and they then left in Craig's car to go to their sister's home. Defendant testified that Cynthia was mad. They went to Cannon's home between 8:30 to 9:00 p.m. Defendant remembered seeing Andre Long, William, Jim and Willie B. at Cannon's house. Defendant told Cannon he was going to the store to get some beer, but Lucy would not take him. Defendant walked to the store and returned with some beer. They stayed there until Cynthia and Carolyn came and he went with them to Carolyn's home. Carolyn asked him about the shooting, but he stated he did not know anything about it. That is when Defendant learned Craig and Billy had shot some people. Defendant testified that he did not know any of the victims.

During cross-examination, Defendant stated he went over to Lucy's house to make a phone call and that is when he asked her for a ride to the store for the beer.

## LEGAL ANALYSIS

### SUFFICIENCY OF EVIDENCE

Defendant asserts that the State failed to establish that Defendant formed any intent to kill any person after reflection and judgment, nor was there any evidence that Defendant made any declarations indicating an intent to kill any of the victims. The State counters that a reasonable jury could find premeditation based on the manner of the circumstances surrounding the shooting of the three victims.

Rule 13(e), Tennessee Rules of Appellate Procedure, prescribes that "findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S. Ct. 2781, 278-9, 61 L.Ed.2d 560 (1979); *State v. Smith,* 24 S.W.3d 274, 278 (Tenn. 2000). Also, a conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal bears the burden of showing that the evidence was insufficient. *McBee v. State,* 372 S.W.2d 173, 176 (Tenn. 1963); *State v. Buggs,* 995 S.W.2d 102, 105-06 (Tenn. 1999).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982); *State v. Smith,* 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. *State v. Buggs,* 995

S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. *State v. Tuggle,* 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. *State v. Morris,* 24 S.W.3d 788, 795 (Tenn. 2000), *cert. denied*, ___ v. ___, 121 S. Ct. 786, 148 L.Ed.2d 682 (2001); *State v. Pappas,* 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

First degree murder is: "(1) A premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202. Tennessee Code Annotated § 39-12-101, Criminal attempt is defined:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

Defendant argues that the State failed to prove beyond a reasonable doubt that the attempted homicide was premeditated in that the intent to kill must be established after a period of reflection and judgment. Tenn. Code Ann. § 39-13-202(d) defines premeditation as:

As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The element of premeditation is a question for the jury which may be established by proof of circumstances surrounding the killing. *State v. Suttles,* 30 S.W.3d 252, 261 (Tenn. 2000), citing *State v. Bland,* 958 S.W.2d 651, 660 (Tenn. 1997). There are several factors which tend to support the existence of this element which include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of

procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. *Id.*

Defendant challenges the State's lack of proof in the record to explain his actions other than he accompanied two persons to the Owens-Corning plant. While proof of motive may help prove premeditation or intent, it is not an element of attempted murder first degree. *See* Tenn. Code Ann. § 39-13-202(a). Thus, a lack of motive does not affect our sufficiency determination to ascertain if the State has proven from the various factors the elements reflection and judgment. We conclude that the circumstances of the attempted killing of the three victims, in this record, taken as a whole, justify a reasonable inference of premeditation. The record established that Billy Rogers obtained his two weapons, a Glock 22 .40 caliber and .380 Lorcin, before going with his brother Craig to the plant and confronting Greg Taylor. Billy gave the .380 to Defendant, who remained outside the plant while Craig and Billy involved themselves in an altercation with Taylor and a gun went off. The record does not establish why Craig felt it necessary to stop the victim's car, but he did. During this encounter, Billy fired his Glock at Torrianto Brown, striking him in the shoulder, then fired at James Carter in the rear seat. For reasons of his own, Defendant got out of the rear of Craig's car, went to the right front door of Brown's car, opened the door and calmly shot Michael Willingham in the head. Then, Defendant opened the rear door and shot James Carter four times.

Not content with shooting the victims, who leave at high speed, Craig and Billy chased the victim's car when additional shots were fired, striking the car. The State's forensic proof revealed the .380 Lorcin, recovered from Billy, was used in the shooting of two of the victims. On his own behalf, Defendant testified he was a good friend of Billy's and was with Craig in the early evening hours of December 5, 1998, but was not involved in the shooting at the Owens-Corning plant. Defendant presented an alibi defense. The victim's testimony placed Defendant at the scene of the shooting, and coupled with the testimony of Craig, the jury found the State's evidence more credible, thus, resolving the issue of premeditation on the part of the State. We agree. There is no merit to this issue.

GUNSHOT RESIDUE TEST

Defendant asserts that the introduction of Defendant's refusal to submit to a gunshot residue test was unfairly prejudicial, in that the State introduced such evidence solely for the purpose of an incriminating inference, that is a consciousness of guil, citing Rule 403, Tenn. R. Evid. The State asserts that the evidence was properly admitted.

Prior to trial, Defendant, in a motion in limine, requested the trial court to instruct the State witnesses to refrain from testifying about Defendant's refusal to give statements to law enforcement officers after his arrest, and Defendant's refusal to perform a residue test on his hands. The State advised the trial court it did not intend to introduce any statements made by Defendant to law enforcement officers. However, the gunshot residue test is not covered by the Fifth Amendment privilege. After taking this motion under advisement, the trial court ruled that the State would be

permitted to introduce evidence that Defendant refused to give hand swabs for gunshot residue tests, but the circumstances surrounding the refusal were inadmissible.

Defendant concedes that hand swabs have been determined to be minor intrusions such that officers are permitted to obtain them incident to a lawful arrest. *State v. Kyger,* 787 S.W.2d 13, 21 (Tenn. Crim. App. 1989). Also, compelling a defendant to provide physical or real evidence does not violate the privilege against self-incrimination. *State v. Frasier,* 914 S.W.2d 467 (Tenn. 1996); *State v. Harris,* 839 S.W.2d 54 (Tenn. 1992). Lieutenant Holt testified that upon the arrests of Craig and Billy Rogers, gunshot residue tests had established that Craig did not fire a weapon; however, Billy had fired a weapon. Both Billy and Craig were arrested within an hour of the shooting. Lieutenant Holt stated Defendant was not arrested for some eight hours after the shooting, but did refuse to give consent for hand swabs for the possibility of the presence of gunpowder residue on his hands. However, Lieutenant Holt advised the District Attorney General's office in a fax that due to the passage of time, such tests may be inconclusive. Although the State, nor the Defendant inquired as to why the test may have been inconclusive, the jury was made aware of this fact.

The question of whether evidence is admissible rests within the sound discretion of the trial court; and this Court will not interfere with the exercise of this discretion unless clear abuse appears on the face of the record. *State v. Hill,* 885 S.W.2d 357, 361 (Tenn. Crim. App. 1994); *State v. Furlough,* 797 S.W.2d 631, 645 (Tenn. Crim. App. 1990), *perm. app. denied*, (Tenn. 1990). In this case, we find the trial court did not abuse its discretion in permitting the State to introduce evidence of Defendant's refusal to submit to a gunshot residue test. A Defendant's refusal to submit to a gunshot residue test can have relevant and probative value as to guilt depending on the facts. *See State v. Morgan,* 692 S.W.2d 428, 430 (Tenn. Crim. App. 1985); *State v. Smith,* 681 S.W.2d 569, 570 (Tenn. Crim. App. 1984). Certainly, a Defendant's refusal may be probative as to whether a Defendant fired a weapon. In this case, the trial court limited the inquiry into the refusal of hand swabs by Defendant and did not permit the State to elicit information as to Defendant's exercise of his rights in refusing to give a statement without the presence of an attorney. We find that the refusal of the hand swabs was not substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403. There is no merit to this issue.

## DOUBLE JEOPARDY

Defendant argues that the trial court erred in merging his convictions for aggravated assault with the two convictions for attempted murder first degree. Defendant would ask this Court, for double jeopardy purposes, to reverse and dismiss the offenses of aggravated assault. The State asserts that the trial court properly merged the two offenses of aggravated assault with the greater offenses of attempted murder first degree.

We would agree with Defendant that the aggravated assault offenses would and should have been reversed and dismissed had not the trial court granted Defendant's amended motion for a new trial, requesting that the convictions for aggravated assault be merged with the convictions for attempted murder first degree in counts 3 and 4 of the indictment. *See State v. Adams,* 973 S.W.2d

224, 229 (Tenn. Crim. App. 1997)(a panel of this Court concluded that dual convictions, in the particular facts of that case for attempted murder first degree and aggravated assault prevented the imposition of multiple convictions. There was no consideration of merger of offenses.)

Three fundamental principles arise in double jeopardy cases: (a) a protection against a second prosecution after an acquittal; (b) protection against a second prosecution after conviction; and (c) protection against multiple punishments for the same offense. *State v. Denton,* 938 S.W.2d 373, 378-79 (Tenn. 1996). A similar question was addressed by this Court in *State v. Banes,* 874 S.W.2d 73, 81 (Tenn. Crim. App. 1993). A Madison County jury returned conviction verdicts against Defendant for aggravated rape and aggravated sexual battery. In dismissing the conviction for aggravated sexual battery, this Court held:

> In the circumstance, in which two guilty verdicts are returned as to alternative charges, the guilty verdict on the greater charge stands and the guilty verdict on the lesser charge merges into the greater charge. *See State v. Davis,* 613 S.W.2d 218 (Tenn. 1981). The judge should enter a judgment of conviction on the greater offense and a judgment merging the lesser offense into the greater. . . . In light of our affirmance of the aggravated rape conviction, we have dismissed the aggravated sexual battery conviction rather than remand for the entry of a judgment of merger.

*Id.*; *See* also *State v. Robertson,* No. W1999-01872-CCA-R3-CD, 2000 WL 1863511, at *4 (Tenn. Crim. App. Dec. 1, 2000), *perm app. denied,* (Tenn. 2001).

We agree with the State that the trial court properly merged the offenses of aggravated assault into the convictions of attempted murder first degree. There is no merit to this issue.

The trial court's judgment is affirmed.

_____
L. TERRY LAFFERTY, SENIOR JUDGE

-9-