# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 6, 2006

## STATE OF TENNESSEE v. RICK HANEBUTT

**Direct Appeal from the Circuit Court for Carroll County**
**No. 04CR-49    C. Creed McGinley, Judge**

---

**No. W2005-01301-CCA-R3-CD  - Filed October 2, 2006**

---

The defendant, Rick Hanebutt, was convicted of first degree premeditated murder and attempted first degree premeditated murder.  He received a sentence of life imprisonment for his murder conviction and a concurrent twenty year sentence for his attempted first degree murder conviction. On appeal, the defendant raises three issues for our review: (1) whether the evidence was sufficient to support his convictions; (2) whether the state failed to comply with discovery pursuant to Rule 16 of the Tennessee Rules of Criminal Procedure; and (3) whether the trial court erred in denying the defendant's motion to change venue.  Following our review of the parties' briefs and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which DAVID H. WELLES, J., joined.  GARY R. WADE, P.J., not participating.

Guy T. Wilkinson, District Public Defender, Camden, Tennessee, for the appellant, Rick Hanebutt.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Robert Radford, District Attorney General; and John W. Overton and Steve Jackson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The proof at trial reflects that the victim, David Tanksley, was shot and killed in November of 2003.  At trial, Agent Brian Byrd of the Tennessee Bureau of Investigation (TBI) testified that he became involved with the case around December 10, 2003, after he received information of a possible homicide in Carroll County.  According to Agent Byrd, he received information from Karla Abbot that the homicide occurred at Leland Holland's Auto Salvage, and Leland Holland, Tenesha

Davies, and a man by the name of "Rick" were involved. Agent Byrd also discovered that the victim, David Tanksley, had been reported missing by his family.

Agent Byrd testified that during the course of the homicide investigation, he talked with Davies. After the discussion, Davies provided Agent Byrd with her own typed statement. From this statement, Agent Bryd interviewed Holland. During this interview, Holland divulged information about the victim's death and where the victim's body was located. Thereafter, Holland led police to the victim's body which had been discarded in the Beach River. According to Agent Byrd, the victim's body was wrapped in a brownish tarp and was floating in the water, held by a root structure extending out of the river bank. The victim's body was then removed from the river and transported to the medical examiner for autopsy and identification.

Agent Byrd testified that after discovering the victim's body, police arrested Holland. Davies was not arrested at this time because she claimed that her involvement in the homicide was the result of being coerced and kidnapped. However, after review of the evidence collected, Davies and the defendant were also charged with the homicide. Agent Byrd also testified that during the investigation he and other police officers collected a UT shirt with blood stains on it, two pistols, and an SKS rifle.

On cross-examination, Agent Byrd acknowledged that during the course of his investigation he discovered that the victim had several altercations with police and was considered dangerous when under the influence of methamphetamine. On recross-examination, Agent Byrd stated that Davies and Holland appeared somewhat desperate when interviewed, whereas the defendant was lucid and thoughtful during his interview.

Lawrence James, a forensic scientist with the TBI, testified that he conducted DNA testing on the UT shirt. Although his testing confirmed that the blood on the shirt was human blood, the testing did not reveal a DNA profile. James explained that the reason for this result was because the shirt had been exposed to the weather. Timothy Meggs of the Carroll County Sheriff's Department testified that he and other officers conducted a search of the defendant's house. During this search, they found two walkie-talkie radios, a twenty-two rifle, a SKS rifle, a sixteen-gauge shotgun, some drugs and drug paraphernalia.

Tenesha Davies testified that she was currently being held in jail for the murder of David Tanksley. She had negotiated an agreement with the District Attorney's Office to testify truthfully against the defendant and Holland. In exchange for her testimony, she would plead guilty to facilitation of murder and serve a twelve year sentence in the Department of Correction.

Davies testified that at the time of the murder, she was going to college to become a nurse. However, she was selling drugs to make money while she went to college. According to Davies, she knew Holland because they did drugs together for about two years. She knew the defendant because he worked for Holland and often stayed with Holland or her friend Didi. She knew the victim because he was a long-time friend of her ex-husband. Davies testified that she sold dope and

methamphetamine and her contact with Holland was drug related. Davies related that she, Holland, the defendant, and the victim were all drug users and the drug activity centered around either Holland's house or his salvage shop which was located about a mile from Holland's house.

Davies testified that she received a call from Holland asking her for some methamphetamine. She had some so she arranged a meeting at his house. While driving to Holland's house, she observed Didi's jeep parked in an unusual location near the gate to Holland's shop. Therefore, Davies picked up Holland at his house and they drove back to Holland's shop. When they arrived at the shop, Holland and Davies went around to the back where they saw the defendant standing near the driver's side of a gray Ford F-150. Davies then saw that the victim was sitting in the truck with one hand on the wheel and the other hand near the ignition. The victim was wearing a light colored sweatshirt that had Tennessee football print on it. The driver side window was rolled down and the defendant and the victim were arguing and exchanging expletives. The defendant told the victim "[F]**k you. You're not taking the truck." The victim responded with "F**k you, yes, I am." While the victim was trying to start the truck, the defendant took a chrome and black handgun and pointed it at the victim's head. Davies then heard a gunshot and the defendant say "You're not going anywhere." She and Holland then ran away, got into her car, and drove back to Holland's house. Once they arrived at the house, Davies asked Holland if they were going to call the police. Holland told her no because the police "were already hot on him for methamphetamines" and he did not want to involve them.

Davies testified that she and Holland drove back to the shop to see what the defendant was doing. As they peered through the gate located about thirty yards from the shop, they saw the victim's body lying on the ground leaned against the back tire of the truck. The defendant had left so Davies and Holland drove to the defendant's house. Upon arrival, Davies noticed that there were a lot of cars parked outside. She went inside the house and Holland stayed outside to talk to the defendant privately. Later, Holland and the defendant came into the house and the defendant gave his guns to a woman named Kathy, telling her to get rid of them. Afterward, Holland and Davies left and went back to Holland's house. Holland and Davies stayed at the house for about an hour smoking dope when Karla Abbott arrived. While everyone was smoking dope, the defendant appeared and yelled, "[t]he mother f**ker just won't die." At the time, the defendant was dressed in army fatigues, he had purple latex gloves on his hands, and he was carrying and a SKS rifle with the blade extended.

Davies testified that the next morning the defendant wanted her to accompany him to the shop and help discard the victim's body. The defendant told Davies that they were going to use her car to haul the victim's body away from the shop. However, when they arrived at the shop, Davies saw that the victim was still alive, sitting on a dirt embankment with his knees drawn up and his arms wrapped around his knees. He was moaning and rocking back and forth. Davies saw that the victim had a hole in the front of his head and the back of his head was swollen. Upon seeing the victim alive, the defendant stated "We've got to do something." The defendant went inside the shop and poured some ether on a rag and held it to the victim's face. The victim responded by jumping up and screaming for his brother to help. As he moved up a small hill, the victim stated that he felt

cold and could not see. While the victim was moving around, the defendant picked up a large stick or 2x4 and hit the victim three times in the head until the victim fell down. Davies saw that the victim was bleeding profusely out of the back of his head and appeared unconscious.

According to Davies, she and the defendant left the victim once again and went back to the defendant's house. Later, Holland arrived and proceeded to discuss with the defendant how to remove the victim from his property. The defendant decided that the victim's body should be dumped into the river. Some eighteen hours after the defendant and Holland left, the defendant called Davies and told her that Holland's wife, Janet, and the victim's brother, Vincent Tanksley, needed to be killed in order to keep the victim's murder a secret. The defendant wanted Davies to help. In response, Davies told the defendant that she "wasn't going on no f**king sprees with him." Davies stated that the defendant told her that he had to shoot the victim again and described this action as a "mercy killing" because the victim was in so much pain. Davies also stated that the defendant left messages on her phone asking her to meet him, but she never did. Davies further stated that she did not tell anyone about the murder because she was scared. On cross-examination, Davies admitted that she was "high the whole time."

Jesse James testified that he was hanging out at the defendant's house one night when the defendant told him and others that he shot the victim. The next morning, the defendant told James that he went back to the shop and the victim was still alive. The defendant then asked James what to do. James responded with "I wouldn't go back." James also told the defendant that he should not have told him about the situation and that he did not want to hear anymore about it. The defendant then left the house, but when he came back later, he told James that he "took care of it."

Karla Abbott testified that she was hanging out at Holland's house when the defendant came through the door exclaiming, "The mother f**ker won't die." The defendant was wearing camouflage clothing, army boots and purple latex gloves. He was carrying an SKS rifle with an extended blade. After the defendant's statement, Holland jumped up from his seat and he and the defendant left the house. Abbot stated that Davies then told her to let whatever she just heard "go in one ear and out the other." Later, the defendant and Holland came back inside the house and retrieved a couple of two-way radios. Abbott stated that the defendant never acknowledged her and she left shortly thereafter.

Abbott testified that on a Saturday around midnight Holland and the defendant came to her house. She observed that Holland was clearly agitated with the defendant. The defendant warned Abbott not to talk. The defendant then led Abbott to his truck and showed Abbott the victim, who was lying in the bed of the truck along with garbage and 2x4s. The defendant told Abbott that if she said a word, the same thing would happened to her and her three children. Abbott stated that Holland calmed her down and told her everything would be all right. Afterward, the two men left.

Abbot recalled that on Monday night, the defendant stopped by again and wanted to talk. He brought with him beer and his SKS rifle. He asked her if she would keep her word. She told him that her word was "rock solid." The defendant then proceeded to tell her what he did to the victim.

He told her that the victim wanted to borrow his truck. When the defendant told him no, he saw the victim reach into his pocket as if reaching for a gun. However, the defendant moved faster than the victim and shot the victim in the head. The defendant then told Abbot that he thought the victim was dead. Later on, however, he realized that the victim was not dead so he tried to smother the victim with a rag soaked in ether. In response, the victim struggled and kept calling for his brother, Vince. The defendant then camped out and watched the victim that night. The defendant told Abbott that he used a 2x4 to finish the victim off and hit the victim in the back of the head with it. However, the victim did not die and so later on the defendant took the victim somewhere else and shot the victim again. Abbott stated that during this conversation, the defendant attempted to call Davies a number times and left threatening messages when she would not answer her phone. The defendant also cut Abbott's phone lines because he did not want her to speak with anyone. The defendant eventually left the following morning.

Abbott testified that on Tuesday night the defendant stopped by again and brought with him a man called "Little Dave." They wanted to talk. Abbott stated that the defendant was carrying the SKS rifle and two pistols, one silver and one black. Abbott said Little Dave also had a pistol. They asked her if she had talked with anyone. She told them no. The defendant repeated his threat to kill her and her children if she said anything about the murder and left after three or four hours. Abbott stated that she felt threatened. After the defendant and Little Dave left, she contacted Steve Lee, the District Attorney, and related to him what the defendant had told her. Lee asked Abbott to invite the defendant back to her home in order to get the defendant to admit to killing the victim on tape. Abbott stated that they attempted to tape her conversation with the defendant twice, but both attempts failed.

David Pinson testified that he worked at Holland's Auto Salvage with the defendant. As he was traveling to Holland's house he saw a black jeep with the doors open parked by the gate. He did not see anyone around and thought it strange. Later, while Pinson was at the defendant's house, the defendant walked up to him and said, "It's done." Pinson testified that at the time, he did not understand what the defendant's statement meant, but thought it might relate to problems the defendant was having with the victim. Pinson knew that the defendant had been angry at the victim in the past.

Pinson testified that about a week later the defendant approached him and attempted to talk to him about shooting the victim. Pinson told him that it was not his business and did not want to hear about it. Nonetheless, the defendant told Pinson that he shot the victim at the shop and then had to shoot him again later. Pinson explained that his nickname was "Little Dave." He recalled that he went with the defendant to Abbott's house. However, Pinson recalled that the conversation with Abbott was friendly. "Everybody was smiles and laughs and talking." Pinson admitted, however, that the defendant brought the SKS rifle with him. On cross-examination, Pinson stated that the victim carried a black nine-millimeter handgun every time he saw him. Pinson also admitted he did not mention the fact that the defendant said he shot the victim a second time in any prior statement though he could not recall why he did not mention this fact.

Dr. Teresa Campbell, a forensic pathologist, testified that the victim died of multiple gunshot wounds to his head. Dr. Campbell stated that from her examination, the type of weapon used remained undetermined. However, Dr. Campbell explained that the nature of the gunshot wound to the front of the victim's head indicated it was caused by a lower velocity weapon such as a handgun, while the wound to the back of the victim's head indicated a high velocity weapon such as a rifle or powerful handgun. Dr. Jennifer Love, a forensic anthropologist, testified similarly. Both Dr. Campbell and Dr. Love stated that they could not rule out the possibility that the victim received injury by blunt force trauma.

In his own defense, the defendant testified about the events that led up to his working for Holland's Auto Salvage and the circumstances surrounding the victim's death. The defendant admitted that he did not get along with the victim, but he claimed that "[t]here was not the animosity that everybody [said] there was." The defendant said that the victim was known to carry either a pistol or some other kind of weapon. According to the defendant, he discovered the victim inside the shop attempting to take some salvage parts from a customer's vehicle. Being suspicious of the victim, the defendant told him to leave the shop. The victim then went to a truck and opened the door. At that moment, the defendant saw the "pistol coming out," so he drew his own gun and fired. The victim fell to the ground. The defendant then heard someone leave the driveway of the shop. The defendant stated that he took the gun from the victim. He also stated that he did not call the police because he was scared and "[t]here was drugs around all the time."

The defendant testified that he went to Holland's house to talk with Holland. He said that when he arrived, Davies and Abbott were there with Holland. The defendant denied wearing purple gloves and carrying a SKS rifle. The defendant recalled that he asked Kathy Franks to come over to his house. When she arrived, he gave her his guns. The defendant stated that he believed that the victim was dead. According to the defendant, the next morning Davies came over to his house and the two of them drove back to the salvage shop. Upon arrival, they found the victim outside of the shop on the ground asleep. The defendant went inside the shop and poured ammonia on a rag and waived it under the victim's nose in order to wake him up. It revived the victim but the fumes blinded him so the victim took off his shirt and started swinging it in "a defense mode." The defendant said he was scared because the victim started walking toward him swinging his arms. The defendant denied hitting the victim with a 2x4. Rather, he locked the shop because he did not want the victim getting inside, then he left with Davies to go see Holland. According to the defendant, the victim was still alive when they left the shop.

The defendant testified that he went to Holland's house and knocked on the door, but eventually he went home after Holland would not answer. Later that evening, Holland and Davies came to his house. Holland wanted the victim's body removed from his property. While Davies got gas for the defendant's truck, he and Holland went to the salvage yard. There, the defendant found the victim lying face down in the yard. Believing that the victim had finally died from the gunshot wound inflicted the previous day, the defendant wrapped the victim's body in a tarp. The defendant and Holland met up with Davies and filled the truck up with gas. Eventually, the defendant and Holland drove to a secluded area and threw the victim's body in the river. The defendant stated that

he stopped by Abbott's after disposing of the victim's body, therefore, she did not see the victim in the truck. The defendant also denied shooting the victim a second time but stated he did not know who did.

Agent Byrd was called as a rebuttal witness. He testified that Pinson did not tell him that the defendant shot the victim a second time. Agent Byrd also testified that eventually police recovered a black truck thought to be the one involved in this homicide. However, no blood evidence or DNA was found in the truck. Tommy Decanter of the Sheriff's Department testified that Holland's neighbors filed complaints in which they claimed they heard multiple gunshots coming from the Holland residence on September 11th, 18th and on December 18th, 2003.

Based upon the evidence presented, the jury found the defendant guilty of first degree premeditated murder and attempted first degree premeditated murder. The trial court sentenced the defendant to a total effective sentence of life imprisonment.

## ANALYSIS

### I. Sufficiency of Evidence

The defendant first argues that the evidence was insufficient to support his convictions. In making this argument, the defendant claims the following: that the evidence proffered by the state did not sufficiently negate his testimony that he acted in self-defense when he shot the victim; that the state did not prove he shot the victim a second time; that the state did not prove that the SKS rifle was the rifle that killed the victim; that the state did not prove the defendant struck the victim with a 2x4; and the evidence failed to establish who actually killed the victim.

In considering this issue of sufficiency of the evidence, we reiterate the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *Id.*

First degree murder is defined in relevant part as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation refers to "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation "means that the intent to kill must have been formed prior to the act itself." *Id.* However, the intent to kill may be formed in an instant and need not pre-exist in the mind of the accused for any definite period of time. *Id.* The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. *Bland*, 958 S.W.2d at 660. Among the circumstances supporting premeditated murder are: a motive for the killing; the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness after a killing. *See State v. Dellinger*, 79 S.W.3d 458, 492 (Tenn. 2002); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn. 1998); *Bland*, 958 S.W.2d at 660. Criminal attempt is explained as follows:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101. In other words, criminal attempt requires the existence of the same culpability required for the attempted crime, and an act in furtherance of the attempted crime. *See Wyatt v. State*, 24 S.W.3d 319, 323 (Tenn. 2000).

Self-defense is legally justified if:

> the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(a). It is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the trier of fact. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). Thus, in the context of "judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to . . . self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *Clifton*, 880 S.W.2d at 743.

Upon review, we note that the defendant's sufficiency argument essentially amounts to a challenge to the jury's credibility determinations. The defendant basically asserts that the state witnesses provided inconsistent and untruthful testimony, and the jury should have believed his testimony that he shot the victim in self-defense. However, to reiterate, it is the jury's prerogative to accredit witness testimony and weigh the evidence. Here, the evidence presented by the state witnesses established that the defendant and the victim did not like each other. At some point in time, the defendant discovered the victim in the auto salvage shop and an argument ensued. During this argument, the defendant put a gun to the victim's head and shot him. Upon shooting the victim in the head, the defendant left the victim lying on the ground. Sometime later, the defendant returned to the shop and discovered the victim was still alive. The defendant then attempted to smother the victim's face with a rag soaked in ether. When this did not work, the defendant hit the victim in the back of the head multiple times with a 2x4. After beating the victim's head with a 2x4, the defendant left the victim alone to die. However, the victim did not die and the defendant shot the victim a second time in the head in order to finish him off. The defendant then disposed of the victim's body by wrapping it up and tossing it in the river. As such, the testimony of the state witnesses clearly showed that the defendant committed the offenses of first degree premeditated murder and attempted first degree premeditated murder. By their verdict, the jury exercised their prerogative and chose to accredit the testimony of the state witnesses over the testimony of the defendant. Accordingly, the defendant's sufficiency argument is without merit.

## II. Discovery

The defendant next argues that the state failed to comply with discovery. Specifically, the defendant asserts that the state did not honor the open file policy and provide an additional oral statement of David Pinson, indicating the defendant shot the victim a second time. The defendant asserts that the failure to submit this oral statement was prejudicial to his case. The state argues that it provided all discovery under its open file policy. The state further argues that the defendant has waived this issue because he failed to object to Pinson's testimony.

We agree with the state. Upon review, the record reflects that the defendant did not object to the testimony of Pinson, but rather, he raised the issue for the first time in his motion for a new trial. It is well-settled that the failure to raise a contemporaneous objection to the admission of evidence at the time the evidence is introduced at trial results in waiver of the particular issue on appeal. *See* Tenn. R. App. P. 36(a); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Therefore, the defendant has waived consideration of this issue. However, regardless of waiver, the defendant has failed to demonstrate that the state violated Rule 16 of the Tennessee Rules

of Criminal Procedure. Rule 16(a)(1)(A) requires the state to disclose the substance of any *oral statement* which the state intends to offer in evidence at trial made by the defendant whether before or after arrest *in response to interrogations* by any person then known to the defendant to be a law enforcement officer. Otherwise, reports or memoranda made in connection with the investigation of a case and *statements made by state witnesses* are not discoverable. *See* Tenn. R. Crim. P. 16(a)(1) and (2). The record reflects that the state provided discovery in compliance with Rule 16. Even assuming arguendo that the state somehow violated Rule 16, the record reflects that Pinson was not the only witness to testify regarding the defendant's admission that he shot the victim twice. Abbott also testified that the defendant admitted he shot the victim twice. As such, the defendant has clearly failed to prove how he was prejudiced by Pinson's testimony. Accordingly, the defendant's issue is not only waived, but it is entirely without merit.

### III. Venue

The defendant next asserts that the trial court erroneously denied his motion for a change of venue. The defendant asserts that change of venue was necessary because his accomplice, Leland Holland, was from Carroll County; and therefore, the jury did not treat him fairly. The state asserts that the defendant has waived this issue by failing to raise it during voir dire.

In the instant case, the record reflects that the trial court denied the defendant's motion for change of venue with allowance for the renewal of this motion during voir dire. However, the record reflects that the defendant did not renew his motion for change of venue during voir dire. In fact, the defendant concedes that he did not renew this motion. Therefore, we conclude that the issue is waived because the defendant failed to take any action to nullify the harmful effect of the alleged error. *See* Tenn. R. App. P. 36(a).

Again, notwithstanding waiver, the defendant's argument fails on the merits. The decision of whether to grant a motion for a change of venue based on pretrial publicity rests within the sound discretion of the trial court, and such a decision will not be overturned on appeal absent a showing of abuse of discretion. *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993). Furthermore, to prevail on appeal, the defendant must show that the jurors were biased or prejudiced against him. *State v. Melson*, 638 S.W.2d 342, 360-61 (Tenn. 1982). "Prejudice will not be presumed on the mere showing that there was considerable pre-trial publicity." *Adkins v. State*, 911 S.W.2d 334, 343 (Tenn. Crim. App. 1994). Rather, the test is "whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." *State v. Kyger*, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989).

In making his argument on appeal, the defendant does not point to any specific instances of prejudice in the record that would have precluded him from receiving a fair trial. Instead, the defendant cites one authority, *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979) to argue that the nature of the verdict returned by the jury proves that change of venue was necessary. We note, however, that *Hoover* lists seventeen factors to consider when deciding whether a change of venue is proper. *See id.* Such factors include the "care exercised in the selection of the jury," the

"ease or difficulty in selecting the jury," the venire's "familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire." *Id*. In the instant case, the record reflects that the jurors were questioned thoroughly about pretrial publicity and each juror was either unaware of the case or gave assurances that they could be fair and impartial when rendering a verdict. The record also reflects that after the jury was selected, the defendant assured the court that the jury was to his satisfaction. Accordingly, the defendant has clearly not met his burden of proving prejudice; and as such, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for change of venue.

## CONCLUSION

Based upon the foregoing review, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE