# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
February 12, 2014 Session

## KEITH WHITED v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Fentress County**
**No. 2012-CR-47      E. Shayne Sexton, Judge**

---

**No. M2012-02294-CCA-R3-PC - Filed May 7, 2014**

---

Keith Whited ("the Petitioner") was convicted by a jury of second degree murder, driving under the influence, and driving on a revoked license. The trial court sentenced the Petitioner to an effective sentence of twenty-three years' incarceration. On direct appeal, this Court affirmed the Petitioner's convictions. See State v. Keith A. Whited, No. M2010-00134-CCA-R3-CD, 2010 WL 4684468, at *8 (Tenn. Crim. App. Nov. 19, 2010), perm. app. denied (Tenn. May 25, 2011). The Petitioner subsequently filed for post-conviction relief, which the post-conviction court denied following an evidentiary hearing. The Petitioner now appeals, arguing that he was denied the effective assistance of counsel at trial and on appeal. Upon our thorough review of the record and the applicable law, we affirm the post-conviction court's decision denying relief.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment
### of the Circuit Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Jason F. Hicks, Cookeville, Tennessee, for the appellant, Keith Whited.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Senior Counsel; C. Berkeley Bell, District Attorney General; and John W. Galloway, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

To assist in the resolution of this proceeding, we repeat here the summary of the facts set forth in this Court's opinion resolving the Petitioner's direct appeal:

Sarah Conatser testified that, on June 30, 2007, she went with her uncle, Russell Honeycutt, and his girlfriend, Evelyn Bennett, to the house that Katrina Honeycutt, her first cousin,[1] and the Defendant shared. She recalled that the Defendant had several guests over and that they were drinking alcohol. She alleged that, while she was there, the Defendant's father, Kirby Whited, lifted up the back of her skirt. She said that she told Evelyn Bennett and Katrina Honeycutt what happened and that Katrina Honeycutt told the Defendant. She testified that the Defendant started kicking a wall and then ordered her to leave. She also said that when she, Evelyn Bennett, and Russell Honeycutt were going to the car, the Defendant pulled out a gun. She recalled that the Defendant was prevented from using it when Katrina Honeycutt tackled him to the ground.

After the incident at the Defendant's house, Sarah Conatser went back to the home she shared with her parents, Sandra and Benny Conatser. She testified that Johnny and Heather Wright, Katrina Honeycutt's sister, along with their two children, were at the Conatser residence. However, she recalled that, when she got to the house, her parents were taking a nap. She said that she did not wake her parents up, but that she did tell Johnny and Heather Wright what happened at the Defendant's house. Sarah Conatser testified that she then went with Russell Honeycutt and Evelyn Bennett to her grandparents' house in Morgan County.

Sarah Conatser also said that the Defendant and her father, Benny Conatser, were good friends and that the Defendant went to the Conatser residence every day. She testified that she did not know of any problems between her father and the Defendant.

---

[1] Because most of the witnesses who testified at trial are related to each other, we will explain the pertinent relationships at the outset. The victim in this case is Benny Conatser. He was married to Sandra Conatser, and they had several children, including Sarah Conatser. Mary Copeland, Sandra Conatser's sister, is the mother of Katrina Honeycutt, the Defendant's girlfriend, and Heather Wright. Heather Wright is married to Johnny Wright, and Jonathan Wright is their son. For clarity, we will refer to the witnesses using their full names.

Sandra Conatser testified that, on the afternoon of June 30, 2007, when she awoke from a nap, Johnny and Heather Wright informed her that her daughter Sarah accused Kirby Whited of lifting up the back of her skirt. Sandra Conatser testified that her husband also heard this and was upset. She testified that, later that evening, the Defendant and Kirby Whited came to the house. She recalled that she, her husband, and Johnny Wright all went outside when they saw the Defendant's vehicle come to the house. Sandra Conatser stated that her husband and Kirby Whited were having "words" about Sarah Conatser's allegations that Kirby Whited lifted up her skirt. Sandra Conatser testified that they told Kirby Whited and the Defendant that they needed to leave and that both men turned and walked toward their vehicle. She described, "And [the Defendant] started to get in, and he just turned around, felt for his gun and come back and shot Benny." She recalled that the Defendant was about ten feet from her husband when he shot him. She testified that her husband did not have any kind of weapon, bat, or stick when he was shot. She testified that, besides cussing at Kirby Whited, her husband did not do anything to hurt the Defendant or his father. She said that her husband was flown to the University of Tennessee Medical Center in Knoxville, but he never regained consciousness and died five days later.

Sandra Conatser said that she knew the Defendant carried a gun with him most of the time and that her husband probably also knew that. She acknowledged that her husband had a temper and had previously shot someone who came to their house with a gun. She also said that she and her husband had been involved in several physical altercations with each other.

Johnny Wright testified that he was at the Conatser residence on June 30, 2007. He said that Sarah Conatser told him that Kirby Whited lifted her skirt up when she was at the Defendant's house. He also stated that he relayed the story to both Sandra and Benny Conatser. Johnny Wright testified that, later that evening, Kirby Whited and the Defendant came over to the Conatser residence. He recalled that Kirby Whited denied Sarah Conatser's allegations and that Benny Conatser was "cussing him, telling him, you know, he didn't appreciate him disrespecting Sarah like he was doing." The Conatsers then told the Defendant and Kirby Whited to leave. Johnny Wright testified that Kirby Whited got into the passenger side of the vehicle and that, when the Defendant got to the driver-side door, he stopped, turned around, pulled out his gun, walked a few steps toward Benny Conatser, and shot him. Johnny Wright recalled that the Defendant was approximately ten to twelve feet from Benny Conatser when he shot him. He testified that Benny Conatser did not have any

kind of weapon, stick, or bat at the time of the shooting. He also said that no blows were exchanged between the men before the Defendant fired the shot.

On cross-examination, Johnny Wright said that he knew the Defendant carried a gun and was sure that Benny Conatser knew that as well because "[e]verybody around there knowed [the Defendant] had a gun." He also acknowledged that he had fights with the Defendant in the past and had even been previously charged with assaulting the Defendant. He explained, "We'd fight and we'd be buddies the next day, man, that's just how it went." However, he did say that, most of the time, their fights occurred after they consumed alcohol. He said that the Defendant acts differently when he drinks a lot and explained, "He's a redneck when he's drunk, you know, likes to jump on people." Johnny Wright also stated that, when Officer Derek Richards took his statement, his wife, Heather Wright, and Sandra Conatser were in the same room and could hear what he was saying.

Heather Wright testified that she was also at the Conatser residence on June 30, 2007, when Kirby Whited and the Defendant came over. She said that she stayed inside the house and looked out the kitchen window, where she could see the Defendant pull out his gun and shoot it. From her vantage point, she could not see Benny Conatser. However, she stated that she did not recall seeing a baseball bat at the Conatser residence, nor did she see Benny Conatser bring anything outside with him when the Defendant and Kirby Whited arrived. Heather Wright also testified that the police did not separate her from her husband and Sandra Conatser when they took her statement.

Officer James Markwood, a police officer in the City of Jamestown, testified that he was on duty on June 30, 2007, and he received a call on the radio around 7:20 p.m. about the shooting. Office Markwood said that he knew who the Defendant was and, as he was heading toward the Conatser residence, he passed a vehicle that matched the description of the Defendant's car. Officer Markwood followed the vehicle and arrested the Defendant. He described, "He appeared to be extremely intoxicated. He had a strong odor of alcoholic beverage come from his person. He was very unsteady on his feet." He also testified that when he checked the Defendant's driver's license, he learned that it had been revoked. Officer Markwood testified that he searched the Defendant's vehicle but did not find a weapon. He stated that the Defendant told him that he threw the gun out on the side of the road. Officer Markwood also testified that he took the Defendant to the hospital so that they could take a blood sample from him and that he sent the sample to the crime lab for processing.

Detective Johnny Murphy stated that he worked for the Fentress County Sheriff's Department and helped investigate the shooting at the Conatser residence on June 30, 2007. He testified that, when he arrived, Officer Derek Richards handed him a .32 caliber automatic empty shell casing that was found in the driveway. He said that the next morning, after officers learned Mr. Conatser sustained an exit wound, they searched the crime scene and found a .32 caliber bullet in the driveway. He testified that officers never found the gun used to shoot Mr. Conatser, despite the fact that they searched the surrounding area with metal detectors. He also testified that officers looked for a baseball bat at the Conatser residence, both the night of the shooting and the next day, but they did not find one.

Investigator Murphy testified that, the morning after the shooting, Kirby Whited[2] gave him the following statement:

> [W]e were at Katrina Honeycutt's home having a cookout. Sarah Conatser told that I had pulled her dress up. Keith told her to leave. She left. Approximately two or three hours later, Keith said he was going to Benny Conatser's home, and I told him that I was going, too.
>
> I got out of the vehicle and got about halfway to the house when Benny came out and hit me . . . in the side of the head with a baseball bat. . . . It knocked me down and he started to do it again, and Keith shot him. We left and Keith took me home, and then . . . he left. After he left, I hid the gun in the woods.

Detective Murphy recalled that he touched and examined Kirby Whited's head but that he did not see any signs that he had been hit with a baseball bat.

Detective Murphy also stated that the Defendant gave him the following statement:

[A]fter me and Dad—Kirby—left the cookout at Mike and . . . Katrina's house, we went to Dad's house and from there to Benny Conatser's to see what was going on. I had been drinking liquor and beer and taking pain pills that day.

---

[2] Kirby Whited was charged with concealing the gun used in the shooting. He and the Defendant were tried together.

Benny came out of the house and hit Dad with a small baseball bat and hit Dad in the face. Dad didn't fall down . . . . But, when we started to leave, Benny acted like he was going to hit him again, so I took the gun out of my pocket and shot [toward][3] Benny. The gun was a small .32 caliber auto. I had only one bullet in the gun. I carry the gun . . . all the time. After I shot, we got into the vehicle and left. After we left Benny's, I don't remember anything until I was getting cuffed.

Sheriff Chuck Cravens testified that he spoke with the Defendant shortly after he was arrested and described his conversation with the Defendant as follows:

He told me that him and his father went to Benny's to talk to Benny about the situation with Sarah and that Benny came out, had a ball bat, and one thing led to another, and they got into . . . an argument and that Benny was hitting his father with a ball bat. And he had the gun in his pocket and said he only had one . . . round in the gun, that's all he'd ever carried in it, and he pulled the gun out and shot toward Benny and shot him.

Sheriff Cravens also testified that Kirby Whited alleged that Benny Conatser had assaulted him with a baseball bat prior to the shooting. Sheriff Cravens elaborated, "He kept rubbing his head, saying that he had knots . . . on his head. And I touched Mr. Whited's head, but I couldn't feel no knots . . . on his head." He also said that he did not see any blood on Kirby Whited's head.

Dr. Darinka Mileusnic–Polchan testified that she is an Associate Professor of Pathology at the University of Tennessee Medical Center in Knoxville and was also Acting Chief Medical Examiner for Knox County.[4] She stated, "Mr. Conatser died of the complication of a single through and through, a gunshot wound of the abdomen. And the complications included the blood loss which resulted in the damage to many internal organs,

---

[3] The transcript reflects that Detective Murphy said "shot Benny." However, on cross-examination, defense counsel pointed out that he left out the word "toward" and Detective Murphy replied that he did not mean to leave out the word. We also note that this statement was entered into evidence as an exhibit[.] However exhibits were not included in the appellate record and, thus, we cannot verify the Defendant's actual words.

[4] The parties stipulated that Dr. Mileusnic-Polchan was an expert in the field of forensic pathology.

particularly the lungs." She said that the bullet entered Mr. Conatser's right abdomen and exited through his left abdomen.

Margaret Massengill testified that she works in the Toxicology Division at the Tennessee Bureau of Investigation (TBI) Crime Laboratory in Knoxville, and she was classified as an expert in the field of toxicology. She stated that she tested the Defendant's blood sample and that his blood alcohol content was 0.23, almost three times the legal limit. When asked how fast people eliminate alcohol from their system, Ms. Massengill said that the average person eliminates approximately 0.02 an hour, provided that they have stopped consuming alcohol. She acknowledged that it was possible that, because the Defendant's blood sample was taken approximately ninety minutes after he was arrested, his blood alcohol level at the time of arrest was 0.03 or 0.04 higher than 0.23.

Stephanie Dodson, a forensic toxicologist in the Blood Alcohol/Toxicology section of TBI's crime lab in Knoxville, was also deemed an expert in the field of toxicology. She testified that she tested the Defendant's blood for drugs and that his blood was positive for Dihydrocodone, Diazepam, and Nordiazepam.

The defense presented testimony from Jonathan Wright, Jr., the nine-year-old son of Johnny and Heather Wright, who was also present at the Conatser residence on the evening of the shooting. He testified that, when the Defendant and Kirby Whited came over to the house that night, Benny and Sandra Conatser, and his father, went outside. He stated that none of them had anything in their hands when they went outside.

Mary Copeland testified that she was the grandmother of Jonathan Wright and the mother of Katrina Honeycutt, the Defendant's girlfriend. She testified that Jonathan Wright, within a few days after the shooting, told her that Benny Conatser hit Kirby Whited with a ball bat before the Defendant shot him. She said that her grandson also told her the same version of events on another occasion.

The Defendant testified on his own behalf. He said that he had known Benny Conatser for about ten years and that he had even lived with the Conatsers for about two or three years. He testified that he and Benny Conatser had no problems with each other. He explained that he often carried a gun because "a lot of people like to jump onto [you] when you're drunk," and mentioned that he and Johnny Wright had fought in the past. The

Defendant testified that his gun was a .32 caliber automatic and that he did not have a permit to carry it.

On the evening of June 30, 2007, the Defendant said that he was going over to Benny Conatser's house to drink and "[s]it around with Benny." He described the events leading up to the shooting as follows:

> Me and Dad got out, started to walk up to the porch there, and Benny started cussing Dad there, hit him in the head—side of the head with a ball bat or in the face, somewhere in the—you know, hit him in the head, and then they told us to leave so we turned around and started to leave, and Benny come like he was gonna hit him again so I pulled my gun and shot toward Benny. And I didn't know if I shot him or not.

On cross-examination, the Defendant admitted that he was drunk on the night of the shooting. He said that all day he had been drinking beer and liquor and that he had also taken pills. He acknowledged that he was driving a vehicle when he was stopped and arrested and that his driver's license had been previously revoked. When asked whether he had brandished his gun at the cookout after Sarah Conatser had accused his father of lifting her skirt, he said that he thought he "had to just to get [Sarah Conatser] to leave."

State v. Keith A. Whited, No. M2010-00134-CCA-R3-CD, 2010 WL 4684468, at *1-6 (Tenn. Crim. App. Nov. 19, 2010), perm. app. denied (Tenn. May 25, 2011) (footnotes in original).

The Petitioner subsequently filed a petition for post-conviction relief, challenging the sufficiency of the evidence at trial and alleging multiple instances of ineffective assistance of counsel at trial and on appeal ("trial counsel"). At the post-conviction hearing, the Petitioner's initial appointed counsel in this case ("initial counsel") testified that his representation with the Petitioner ended when he was hired to be an assistant district attorney.

Initial counsel recalled that, during the time of his representation of the Petitioner, he met with several of the Petitioner's family members and potential witnesses. He felt certain that he would have prepared notes from those meetings. Although he could not remember exact details, he also felt certain that he would have given at least a copy of everything in the Petitioner's file to trial counsel upon trial counsel's appointment.

On cross-examination, initial counsel confirmed that, once he became an assistant district attorney, he did not discuss with others in the district attorney's office any facts of the case or details regarding his conversations with the Petitioner.

The Petitioner testified that he told initial counsel about all of the potential witnesses that he also had discussed with trial counsel. He estimated that he met with trial counsel approximately four times prior to trial. According to the Petitioner, however, trial counsel "didn't really act too interested" in the Petitioner's case. After the Petitioner was convicted, trial counsel filed a motion for new trial. When that motion was denied, trial counsel told the Petitioner that "he was done." The Petitioner believed that to mean that trial counsel would not file the Petitioner's appeal. Accordingly, the Petitioner filed his own notice of appeal. He attempted to contact trial counsel before filing the notice of appeal but never received a response. The Petitioner confirmed that trial counsel was ordered to represent him on appeal but stated that he (the Petitioner) was unaware of any of trial counsel's actions in that regard until learning from an online database at the prison that trial counsel had filed an appellate brief.

Pertaining to the trial, the Petitioner stated that he wanted trial counsel to call Steve Royer as a witness but that trial counsel did not call him. He explained on cross-examination that Royer would give "his input on[] their everyday living . . . always fighting each other over there." The Petitioner recalled that trial counsel did not speak with him about the case between the first and second day of trial.

On cross-examination, the Petitioner acknowledged that everyone who was at the scene when the victim was shot testified as a witness at the preliminary hearing. Furthermore, he was not alleging that someone else was present who was not called to testify. The Petitioner did not deny that he "shot a gun whose bullet hit [the victim] and caused him to die." According to the Petitioner, however, he shot the victim because he "didn't feel [he] had any other choice. It was just a reaction." Essentially, the Petitioner believed that he was protecting his father from the victim. The Petitioner agreed that he was "very intoxicated" at the time of the shooting.

Grant Steven Royer testified that he was a friend of the Petitioner's and the victim's in this case. He stated that the Petitioner and the victim were "good friends" and "drinking buddies" and did not recall ever seeing them fight with each other or anyone else. He agreed that the victim's family was "known as the fighting sort." Although he stated that the victim's family was known for "jumping at people," he denied ever witnessing that behavior from the victim. On cross-examination, Royer acknowledged that the victim was physically ill at the time that he was shot. He noted that he and the Petitioner had gone to the hospital together on several occasions to visit the victim.

-9-

Katrina Honeycutt, the Petitioner's girlfriend of at least fourteen years, testified that she and the Petitioner were dating at the time that the victim was shot. She met with trial counsel on the Petitioner's behalf three or four times, but trial counsel "would never let [her] know anything" pertaining to the case. Honeycutt mentioned several individuals whose names she gave to trial counsel on the Petitioner's behalf, but she acknowledged that the substance of each of these individuals' testimony essentially came out at trial through another witness. She insisted, however, that these individuals "had a few other words and more detail." According to Honeycutt, trial counsel told her that the reason he was not speaking to all of these individuals personally was because he had reviewed initial counsel's notes.

Jonathan Wright, Jr., testified that he was fourteen years old at the time of the post-conviction hearing. He identified at the hearing a letter he wrote to the Petitioner. Although the letter indicated that Jonathan was "made to lie" and that he sought forgiveness from the Petitioner, Jonathan denied that he was forced to lie. Rather, he stated that Honeycutt told him that he was forced to lie and that he simply wrote down her words.

On cross-examination, Jonathan agreed that he was present when the victim was shot. He was sitting in the living room[5] and saw the events that transpired outside through the window. Jonathan denied seeing anyone with a baseball bat or telling anyone "that there was a baseball bat." Although he apologized in the letter, he clarified that the apology was because he had testified against the Petitioner at trial.

Honeycutt was re-called to testify at the post-conviction hearing. She testified that Jonathan was at her residence one day and expressed concern to her that the Petitioner hated him. Honeycutt assured him that the Petitioner did not hate him, but Jonathan asked if he could write the Petitioner a letter. After getting permission from his parents, Jonathan wrote the letter to the Petitioner while at Honeycutt's residence. Honeycutt confirmed that she read the letter but denied telling Jonathan what to say in the letter.

Heather Wright, Jonathan's mother, testified that she was at the victim's residence when the victim was shot. She agreed that she shared with Jonathan the details regarding what she saw that day but denied ever telling him what he was to say regarding the events that transpired.

Sandra Conatser testified that she spoke with a juror after that juror was dismissed. She explained that the dismissed juror was an acquaintance, and Conatser had given her a cigarette. Conatser denied speaking to this juror about the case.

---

[5] Although Jonathan does not specify the residence where he was, his mother, Heather Wright, later testified that they were at the victim's residence.

Trial counsel testified that he was appointed to represent the Petitioner in approximately January 2008. He recalled meeting with the Petitioner where he was incarcerated shortly after trial counsel's appointment but did not recall specifically any other meetings prior to trial. Trial counsel did not remember receiving the Petitioner's case file from initial counsel. Regarding his first meeting with the Petitioner, trial counsel recalled,

[W]e talked about the events that occurred on the night that this shooting happened, we talked about . . . who was there, who may have seen anything, . . . as far as potential witnesses. And of course, [the Petitioner] told me that [the victim] had a bat, that [the victim] had struck . . . [the Petitioner's] father Kirby in the head, was getting ready to hit him again when [the Petitioner] pulled this gun and shot him. And like I said, we spoke about the witnesses who were present at the time. And there were three adults there that – of course, [the victim's] widow, her daughter and her husband and two minor children as well as [the Petitioner] and his father Kirby. And we spoke about what the witnesses would – may have saw [sic], and it was brought up about the young boy stating that he had seen [the victim] have a bat on the night of the incident.

Trial counsel recalled that he met with the "young boy,"[6] as well as the boy's grandmother and another individual. However, when trial counsel interviewed that boy, the boy denied seeing the victim with a bat on the night of the shooting. Trial counsel agreed that he met with Katrina Honeycutt on several occasions prior to trial.

Trial counsel did not consider filing a motion for change of venue because he did not believe "that there was enough widespread exposure or anything that would taint a possible jury from Fentress County." He estimated that Fentress County currently had a population of approximately 15,000 to 20,000 people. Trial counsel was aware that the victim had "quite a few relatives" who resided in the county. When asked whether this case received much publicity in comparison to similar cases, trial counsel answered, "No, I don't believe it did. I mean, of course, you know, it was reported in the newspaper about the shooting but as far as any extensive talk surrounding it, no."

According to trial counsel, he had adequate time to prepare for trial because "[t]here wasn't a lot of factual issues or things of that nature to investigate. . . . [I]t was basically whether or not it was a case of self-defense, whether he was justified in shooting [the victim]." He stated that he did not file a motion to sequester the jury "because after the first day of proof, the Judge instructed the Jury very clearly on not to speak to anyone about the

---

[6] Although trial counsel does not identify the "young boy" by name, it seems apparent from the record that trial counsel is referring to Jonathan Wright, Jr.

case, not to look at newspapers, listen to the radio or anything." Moreover, he "thought [the trial court] gave adequate instructions to prevent [the jury] from being tainted in some way." Generally, trial counsel believed that jurors "for the most part" follow instructions given to them by the trial court. Trial counsel acknowledged, however, that "it might have been a good idea to go ahead and file the motion."

> Regarding the Petitioner's appeal, trial counsel testified,

> After we had the hearing on the motion for new trial and it was denied, I spoke to [the Petitioner], and I said, I can file the appeal for you, I don't see any – any new grounds to file the appeal on, I said, other than if you want to file for ineffective assistance of counsel, is the only other new ground I could possibly see that an appeal would be filed on.

The Court of Criminal Appeals, however, ordered trial counsel to file an appeal on the Petitioner's behalf. After filing the appeal for the Petitioner, trial counsel received the opinion of the Court of Criminal Appeals, but he did not send the opinion to the Petitioner because he believed that the Petitioner would receive his own copy. Trial counsel did not file a request for permission to appeal to the Tennessee Supreme Court, nor did he speak with the Petitioner about the Petitioner's right to do so. Trial counsel admitted that he was not comfortable with the appellate process because he only had handled three or four appeals. He acknowledged that several issues on appeal were waived because of his failure to support those issues with sufficient argument or citation to authorities. Although the Petitioner's sentencing hearing was in June 2008 and the hearing on his motion for new trial was not until January 2009, trial counsel did not recall meeting with the Petitioner in the interim.

At the conclusion of the hearing, the post-conviction court determined that the Petitioner was not entitled to relief. Specifically the post-conviction court noted that trial counsel's assistance on appeal was "less than stellar" but determined that the Petitioner had not met his burden of establishing deficient performance or prejudice. The court also stated that trial counsel's decision not to file motions for change of venue or sequestration was perhaps "not the best practice" but determined that the Petitioner suffered no prejudice. The post-conviction court subsequently issued a written order denying relief on June 19, 2013. In its order, the post-conviction court determined that trial counsel was not ineffective in his preparation for trial. Moreover, the post-conviction court determined that any deficiency of trial counsel did not result in prejudice to the Petitioner. Following the post-conviction court's denial of relief, the Petitioner timely appealed.

**Analysis**

Relief pursuant to a post-conviction proceeding is available only when the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006); see also Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

*Ineffective Assistance of Counsel at Trial*

The Petitioner argues that he was denied the effective assistance of counsel at trial. The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[7] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

_____

[7] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688). Our supreme court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The Petitioner asserts that trial counsel was ineffective at trial in (1) failing to investigate the Petitioner's case and meet with the Petitioner and (2) failing to "file important

-14-

motions to sequester the jury and/or change venue." We will address each of these assertions in turn.

We first will assess the Petitioner's claim that trial counsel failed to investigate the Petitioner's case and meet with the Petitioner. As part of that argument, the Petitioner also claims that trial counsel failed to call Steven Royer as a witness at trial. In denying relief, the post-conviction court found that "this case was well tried," "issues that were necessary to get to a jury were raised," and trial counsel "effectively examined witnesses" and "attempted to impeach" the State's witnesses.

The record does not preponderate against the post-conviction court's findings. At the post-conviction hearing, the Petitioner estimated that he met with trial counsel approximately four times. Although trial counsel was appointed to the case only a few months prior to trial, he stated that he felt adequately prepared to present a defense at trial, given that the main issue was self-defense and defense of others. Initial counsel testified that he met with several potential witnesses and felt certain that he would have given at least a copy of everything in the Petitioner's file to trial counsel. We agree with the post-conviction court that the Petitioner failed to establish that trial counsel was deficient in his representation of the Petitioner in this regard.

Specifically with regard to trial counsel's decision not to call Steven Royer as a witness at trial, the record indicates that Royer was not at the scene at the time of the shooting. Rather, the Petitioner wanted to call Royer solely to attempt to establish the victim's proclivity for fighting. When Royer testified at the post-conviction hearing, however, he stated that the Petitioner and the victim were "good friends" and "drinking buddies" and did not recall ever seeing them fight with each other or anyone else. Although Royer agreed that the victim's family was "known as the fighting sort" and known for "jumping at people," he denied ever witnessing that behavior from the victim. Significantly, Royer acknowledged that the victim was physically ill at the time that he was shot and that Royer and the Petitioner had visited him in the hospital on several occasions due to this illness. Thus, the Petitioner has not presented proof to establish a reasonable probability that, had trial counsel called Royer as a witness, the result of the proceeding would have been different. See Vaughn, 202 S.W.3d at 116.

We next turn to the Petitioner's allegation that trial counsel failed to file motions for a change of venue or to sequester the jury. Looking first at whether trial counsel's failure to file a change of venue amounted to deficient performance, the Tennessee Rules of Criminal Procedure provide that "venue may be changed . . . if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." Tenn. R. Crim. P. 21(a). This Court has stated that "[t]he ultimate test is whether the jurors who actually sat and rendered verdicts

-15-

were prejudiced by the pretrial publicity." State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989) (citing State v. Garland, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981)). Prejudice will not be presumed by a mere showing that there was considerable pretrial publicity. Dobbert v. Florida, 432 U.S. 282, 303 (1977); Kyger, 787 S.W.2d at 19.

At the post-conviction hearing, trial counsel testified that he did not file a motion for change of venue because he did not believe "that there was enough widespread exposure or anything that would taint a possible jury from Fentress County." He estimated that Fentress County currently had a population of approximately 15,000 to 20,000 people. Trial counsel was aware that the victim had "quite a few relatives" who resided in the county. The Petitioner has failed to establish that the jury in this case was "prejudiced by the pretrial publicity." Kyger, 787 S.W.2d at 18-19. Rather, when asked whether this case received much publicity in comparison to similar cases, trial counsel answered, "No, I don't believe it did. I mean, of course, you know, it was reported in the newspaper about the shooting but as far as any extensive talk surrounding it, no." Thus, we must presume that trial counsel's tactical decision "falls within the wide range of reasonable professional assistance." Honeycutt, 54 S.W.3d at 767. Therefore, the Petitioner has failed to establish deficient performance on the part of trial counsel. Accordingly, we need not address the prejudice prong. See Goad, 938 S.W.2d at 370.

The Petitioner's final claim of ineffective assistance of counsel at trial is that trial counsel failed to file a motion to sequester the jury. Tennessee Code Annotated section 40-18-116 states, "In all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound discretion of the trial judge, which shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." Tenn. Code Ann. § 40-18-116 (2006).

Trial counsel testified that he did not seek juror sequestration at trial "because after the first day of proof, the Judge instructed the Jury very clearly on not to speak to anyone about the case, not to look at newspapers, listen to the radio or anything." Moreover, he "thought [the trial court] gave adequate instructions to prevent [the jury] from being tainted in some way." Generally, trial counsel believed that jurors "for the most part" follow instructions given to them by the trial court. Furthermore, as noted previously, when asked whether this case received much publicity in comparison to similar cases, trial counsel answered, "No, I don't believe it did. I mean, of course, you know, it was reported in the newspaper about the shooting but as far as any extensive talk surrounding it, no." Thus, we conclude that the Petitioner has failed to establish that trial counsel was deficient in this regard. Therefore, we need not consider the prejudice prong. See Goad, 938 S.W.2d at 370.

Accordingly, the Petitioner has failed to establish ineffective assistance of counsel at trial, and he is entitled to no relief on this issue.

*Ineffective Assistance of Counsel on Appeal*

The Petitioner also argues that he received ineffective assistance of counsel on appeal. The Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution guarantee a criminal defendant the right to representation by counsel on his first appeal.  See Douglas v. People of State of Cal., 372 U.S. 353, 358 (1963); Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).  As with trial counsel, the right to representation of appellate counsel also "necessarily includes the right to effective assistance of counsel." Campbell, 904 S.W.2d at 596 (citing Evitts v. Lucey, 469 U.S. 387 (1985)).  The same principles apply in determining effective assistance of both trial and appellate counsel, and a petitioner must show both deficient performance and prejudice.  Id.  That is, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal."  Campbell, 904 S.W.2d at 597; see also Carpenter v. State, 126 S.W.3d 879, 886-88 (Tenn. 2004).

The Petitioner claims that trial counsel was ineffective on appeal in: (1) failing to present adequate legal arguments in his appellate brief; (2) failing to meet with the Petitioner in preparation for appeal; and (3) failing to communicate with the Petitioner about requesting permission to appeal to the Tennessee Supreme Court.  We turn first to the Petitioner's assertion that trial counsel provided ineffective assistance on appeal by failing to cite to authority in the appellate brief on direct appeal, which resulted in the waiver of three issues. In Carpenter, our supreme court applied the following analysis to the situation of counsel's failing to address certain issues on appeal:

> If a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, as it is in this case, then the reviewing court must determine the merits of the issue.  See, e.g., Kimmelman v. Morrison, 477 U.S. 365, 375, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).  Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it.  Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal.  When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim.  See United States v. Dixon, 1 F.3d 1080, 1083 (10th Cir.1993).

Id. at 887-88.  This Court has applied this analysis outlined in Carpenter to a case in which an issue was waived on direct appeal due to deficient presentation of that issue.  See Russell Lenox Hamblin v. State, No. M2012-01649-CCA-R3-PC, 2013 WL 5371230, at *7 (Tenn. Crim. App. Sept. 26, 2013), perm. app. denied (Tenn. Feb. 24, 2014).

-17-

In applying the analysis outlined in Carpenter, we hold that the Petitioner has failed to establish prejudice with respect to this claim on any of the three issues waived on direct appeal. The three issues waived on direct appeal were as follows: (1) "because the police took the statements of Johnny Wright, Heather Wright, and Sandra Conatser while they were all in the same room, 'the testimony of the three eyewitnesses for the State was tainted and should have been disregarded'"; (2) "the police investigation was mishandled and the crime scene was not protected"; and (3) "Detective Murphy's testimony was inconsistent between the preliminary hearing and the trial." The Petitioner has failed completely to present any argument that, had trial counsel adequately addressed these issues, a reasonable probability would exist that the result of the appeal would have been different. See Campbell, 904 S.W.2d at 597. Upon our review of the issues in the trial transcript and the opinion of this Court on direct appeal, we conclude that these issues would not have been successful on appeal. First, no contemporaneous objection was raised at trial with respect to any of these issues. Second, trial counsel addressed each of these issues through thorough cross-examination and in his closing argument. Accordingly, the Petitioner cannot establish prejudice. See Carpenter, 126 S.W.3d at 887. Therefore, we need not address the deficiency prong. See Goad, 938 S.W.2d at 370.

The Petitioner also contends that appellate counsel was ineffective in failing to meet with him after the trial court's denial of the motion for new trial. Once again, the Petitioner has failed to demonstrate that, had trial counsel met with the Petitioner in preparation for appeal, a reasonable probability would exist that the result of the appeal would have been different. See Campbell, 904 S.W.2d at 597. Therefore, because the Petitioner has failed to establish prejudice, we need not consider the deficiency prong. See Goad, 938 S.W.2d at 370. Accordingly, the Petitioner is entitled to no relief on this issue.

Finally, the Petitioner claims that appellate counsel was ineffective in failing to communicate with the Petitioner regarding the filing of a request for permission to appeal to the Tennessee Supreme Court. We note that, according to the record on appeal, the Petitioner filed a pro se request for permission to appeal that initially was dismissed as untimely. According to the records of the Clerk of this Court, however, our supreme court recalled the mandate and considered the Petitioner's request on the merits. See Harris v. State, 301 S.W.3d 141, 147 n.4 (Tenn. 2010) ("The Court may take judicial notice of its own records.") (citing State v. Lawson, 291 S.W.3d 864, 869-870 (Tenn. 2009)). Ultimately, the Petitioner's request was denied. Therefore, given that the Petitioner was able to request permission to appeal, he once again has failed to establish prejudice. Thus, we need not consider the deficiency prong. See Goad, 938 S.W.2d at 370. Accordingly, the Petitioner is entitled to no relief on his claims of ineffective assistance of counsel on appeal.

## CONCLUSION

For the foregoing reasons, we conclude that the Petitioner is not entitled to post-conviction relief. Therefore, we affirm the judgment of the post-conviction court.

_____
JEFFREY S. BIVINS, JUDGE